**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHANEL CRYER, ET AL.,          ) <br>     Individually and on behalf of all   ) <br>     others similarly situated,       ) <br>                     ) <br>        Plaintiffs,         ) <br>                     ) <br> v.                          ) <br>                     ) <br> INTERSOLUTIONS, INC., ET AL.,   ) <br>                     ) <br>        Defendants.       ) <br> _____) | Case No. 06-02032 (EGS) |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS COUNT II
OF PLAINTIFFS' AMENDED COMPLAINT**

Plaintiffs and the proposed class members are current and former employees of defendant InterSolutions, Inc., a temporary employment agency. As alleged in plaintiffs' Amended Complaint [ECF Document 6], defendants violated the core requirement of Federal and Maryland wage and hour laws when, for years, it denied plaintiffs overtime pay when they worked beyond 40 hours per week. Amended Complaint ¶¶ 23, 65, 73. Defendants have been repeatedly informed that InterSolutions' overtime policies were illegal, but continued to refuse to make the appropriate overtime payments. *Id.* at ¶¶ 34-35. Their practices were systematic, willful, and intentional. *Id*. at ¶¶ 67, 75.

Before the Court now is defendants' Motion to dismiss Count II of the Amended Complaint, the Maryland wage and hour class claim. Their Motion is based almost entirely on a misguided attempt to convince this Court of the salience of the distinction between Maryland's wage and hour class claims, the adjudication of which would be governed by an "opt-out" class action procedure, and plaintiffs' FLSA class claims, which pursuant to the FLSA's own

collective action procedures would require class members to opt in.  Defendants state, at various points, that opt-in rights under the FLSA and the opt-out scheme of Rule 23 are "inherently incompatible" (Def. Brief at 3); that "[i]t is by now well-established that this combination of an opt-in collective action and an opt-out class action should not be permitted to co-exist within the same case" (at 2); that the "Maryland overtime class action claim under Rule 23 conflicts irreconcilably with federal law" (at 4); and they even go so far as to say that an opt-out class alleging claims under Maryland law is "expressly preempted by the opt-in requirements in the FLSA" (at 4).  On the basis of these contentions, defendants argue that the Court cannot exercise supplemental jurisdiction over plaintiffs' Maryland law claims under 28 U.S.C. § 1367, and therefore that they should be dismissed.

Eight months ago, however, the D.C. Circuit ruled squarely contrary to defendants' arguments when it decided *Lindsay* v. *GEICO*, 448 F.3d 416 (D.C. Cir. 2006).  In *Lindsay*, the D.C. Circuit held that there was nothing inherently incompatible between the FLSA's opt-out procedures and the opt-in procedures governing an analogous state law wage and hour class claim.  It further held that the District Court was required to exercise supplemental jurisdiction over such an analogous state law claim, except in narrow circumstances unrelated to the opt-in/opt-out distinctions.  As the D.C. Circuit explained in *Lindsay*:  "[w]hile there is unquestionably a difference indeed, an opposite requirement between opt-in and opt-out procedures, we doubt that a mere procedural difference can curtail section 1367's jurisdictional sweep."  *Id.* at 424.   The Court further stated:

> "[S]ection 216(b) [of the FLSA] states, 'No employee shall be a party plaintiff to any such *action* unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought,' 29 U.S.C. § 216(b) … [[Defendant] argues that section 216(b)'s use of the term 'action' – as opposed to 'claim' or 'cause of action' – manifests that the Congress intended to

require opting-in for the entire litigation, not merely the FLSA clams.  **We are not persuaded by this argument**.”  (Emphasis added.)

*Id.* at 422.  Defendants are well aware of *Lindsay*, having attempted to bury it on pages 34-35 of their brief.  Their attempts to distinguish it, however, are not apt, and their interpretation of the decision is simply erroneous.

Of the remainder of defendants' arguments, the only one not controlled by *Lindsay* is their claim that a class is not the "superior method" under Rule 23(b)(3) for fair adjudication of the Maryland-law claims.  That argument is first and foremost premature, as plaintiffs have not yet moved for certification of that class.  And it would be absurd to conclude that a separate class action in state court arising out of these same facts, or, worse, a series of individual actions in state court raising these exact issues, would somehow be superior to a single action in federal court that would resolve all of plaintiffs' claims in one action.

## ARGUMENT

Defendants make two distinct arguments for dismissal of plaintiffs' state law claims: first, that this Court cannot and should not hear the state-law class action simultaneously with an FLSA collective action, and second, that the state-law class action cannot be certified (and should therefore be dismissed) because it fails the "superiority" requirement of Fed. R. Civ. P. 23(b)(3).  The first argument is foreclosed by the controlling precedent of this Circuit; the second is both premature and meritless.

**I.     THIS COURT HAS MANDATORY JURISDICTION OVER THE STATE-LAW CLASS ACTION UNDER *LINDSAY*, AND NO DISCRETIONARY BASIS EXISTS FOR DECLINING THAT JURISDICTION.**

> **A.     *Lindsay* Rejected Defendants' Assertions That The Court Should Decline To Exercise Its Jurisdiction Over Plaintiffs' State Law Claims.**

As noted above, the D.C. Circuit has conclusively resolved the key questions raised by defendants' Motion.  *Lindsay* held that federal courts hearing FLSA collective actions have

supplemental jurisdiction under 28 U.S.C. § 1367(a) over state-law class claims, which

jurisdiction the court may decline to exercise only in very limited circumstances not present here.

Most importantly, *Lindsay* forecloses defendants' argument that the differences between opt-in

procedures under the FLSA and opt-out procedures under Rule 23 allow the Court to decline to

exercise supplemental jurisdiction under § 1367.

In *Lindsay*, the plaintiffs sought to recover unpaid overtime under both the FLSA and the

New York Minimum Wage Act.  448 F.3d at 418.  There, as here, the defendant argued that the

state-law class action could not proceed because the plaintiff had also asserted an FLSA claim.

*Id*. at 422-23.  The District Court denied a request to certify the New York claims under Rule 23

because "the FLSA class certification procedure requiring all class members to affirmatively opt

in precluded it from exercising supplemental jurisdiction over those state law claimants who did

not affirmatively join the FLSA claim."  *Id.* at 418.

The D.C. Circuit, however, "disagree[d]," and reversed.  *Id*.  It held that federal courts

have supplemental jurisdiction under 28 U.S.C § 1367(a) over state-law overtime class actions.

*Id*. at 421-22.  And this supplemental jurisdiction is mandatory; District Courts must retain

jurisdiction over state law claims unless one of the discretionary factors in § 1367(c) applies.  *Id*.

at 421.  In reaching this conclusion, the Circuit rejected defendants' central contention that the

FLSA's opt-in procedure and the opt-out procedure of Rule 23 are inherently incompatible,

explaining:  "While there is unquestionably a difference – indeed, an opposite requirement –

between opt-in and opt-out procedures, we doubt that mere *procedural* difference can curtail

section 1367's jurisdictional sweep."  *Id*. at 424.

For these reasons, defendants' arguments that the FLSA opt-in class and the Rule 23 class of claims arising under Maryland law are inherently incompatible, and that the FLSA claims preempt the state law claims, can easily be rejected on the basis of controlling authority.

**B.    Defendants Have Failed To Demonstrate That This Court Should Ignore *Lindsay* And Decline To Exercise Its Supplemental Jurisdiction Over Plaintiffs' State Law Claims.**

As discussed above, this Court need look no further than the on-point law of the D.C. Circuit to deny defendants' Motion. Defendants, however, seek refuge in a few selected out-of-Circuit cases, while failing to acknowledge that those cases are, in fairness, minority positions even outside of this Circuit.[1] Despite this authority, defendants argue that the § 1367(c) factors permit the Court to decline to exercise jurisdiction over the state law claims. None of these arguments warrants ignoring *Lindsay*.

Under 28 U.S.C. § 1367(c), a court may decline to exercise supplemental jurisdiction if:

"(1) the claim raises a novel or complex issue of State law,
(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

---

[1]    *See, e.g., Trinidad* v. *Breakaway Courier Sys., Inc.*, 2007 U.S. Dist. LEXIS 2914 (S.D.N.Y. Jan. 12, 2007) (allowing FLSA collective action and certifying Rule 23 state law overtime class); *Torres* v. *Gristede's Operating Corp.*, No. 04-Civ.-3316, 2006 U.S. Dist. LEXIS 74039 (S.D.N.Y. Sept. 29, 2006) (allowing FLSA collective action and Rule 23 state law class action); *Romero* v. *Producers Dairy Foods, Inc.*, 235 F.R.D. 474 (E.D. Cal. 2006) (certifying FLSA opt-in class and state law class under Rule 23); *Mascol* v. *E&L Transportation, Inc.*, No. CV-03-3343 CPS, 2005 WL 1541045 (E.D.N.Y. June 29, 2005) (allowing FLSA collective action and certifying Rule 23 New York state overtime class); *Goldman* v. *Radioshack Corp.*, No. Civ.A. 03-0032, 2005 WL 1124172 (E.D. Pa. May 9, 2005) (same); *Scholtisek* v. *Eldre Corp.*, 229 F.R.D. 381 (W.D.N.Y. 2005) (allowing FLSA collective action and certifying Rule 23 New York state law overtime class); *McLaughlin* v. *Liberty Mut, Ins. Co.*, 224 F.R.D. 304 (D. Mass. 2004) (allowing FLSA collective action and certifying Rule 23 state law overtime class of auto damage appraisers); *Smellie* v. *Mount Sinai Hosp.*, No. 03 Civ. 0805, 2004 WL 2725124 (S.D.N.Y. Nov. 29, 2004) (allowing FLSA collective action and certifying Rule 23 New York state law overtime class); *Noble* v. *93 University Place Corp.*, 224 F.R.D. 330 (S.D.N.Y. 2004) (same); *Robinson* v. *Eastman Kodak Co.*, No. 02-CV-6204T(F), 2003 WL 24183368 (W.D.N.Y. April 9, 2003) (same); *Scott* v. *Aetna Servs., Inc.*, 210 F.R.D. 261 (D. Conn. 2002) (permitting FLSA collective action and state law class action); *Beltran-Benitez* v. *Sea Safari, Ltd.*, 180 F. Supp. 2d 772 (E.D.N.C. 2001) (permitting FLSA opt-in class and Rule 23 class under North Carolina law, as "FLSA's prohibition of Rule 23 class actions does not bar the application of Rule 23 to a separate cause of action in the same complaint"); *Ansoumana* v. *Gristede's Operating Corp.*, 201 F.R.D. 81, 94-95 (S.D.N.Y. 2001) (allowing FLSA collective action and certifying Rule 23 New York state overtime class); *Ladegaard* v. *Hard Rock Concrete Cutters, Inc.*, No. 00-C-5755, 2000 WL 1774091 (N.D. Ill. Dec. 1, 2000) (allowing FLSA collective action and certifying Rule 23 state law overtime class).

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction."

Although *Lindsay* was decided under § 1367(a), the Court found that in determining whether one of the discretionary factors in § 1367(c) applies, the District Court's authority is "circumscribed." *Id.* at 424.

In assessing the § 1367(c) factors, *Lindsay* teaches that none applies here. First, § 1367(c)(1) did not apply because the claims in *Lindsay* were wage and hour claims under New York law, which the court found were "not novel or complex." *Id.* at 424. The same is true of the Maryland law claims at issue here. Second, "[p]redomination under section 1367(c)(2) relates to the type of claim." *Id.* at 425. That provision is not applicable here, because as *Lindsay* shows, "the state law claims essentially replicate the FLSA claims – they plainly do not predominate." *Id.* Third, § 1367(c)(3) does not apply because the FLSA claims have not been dismissed. And fourth, there are no "compelling reasons" that make this an exceptional situation in which jurisdiction should be declined. While the Circuit in *Lindsay* remanded to permit the District Court to consider this issue, it explained that a District Court "may not use subsection (c)(4) to conclude that section 216(b)'s opt-in provisions ousts the court of supplemental jurisdiction over the state law class." As the Court explained, "[w]e do not view the difference between the opt-in procedure provided by section 216(b) for FLSA claims and the opt-out procedure for state law claims provided by Rule 23 as filling the 'exceptional circumstances'/'other compelling reasons' language of section 1367(c)(4)." *Id.* at 425.

Despite this on-point authority, defendants nonetheless make a scattershot of arguments concerning § 1367(c), to which we now turn.

> **1.    The Maryland law claim does not raise novel or complex issues of state law.**

This case plainly does not raise a novel or complex issue of state law.  Indeed, as in *Lindsay*, "the state law claims are not novel or complex," but are rather routine unpaid overtime claims alleging that the class was not properly compensated for hours worked over 40 in a workweek.  See 448 F.3d at 424.

Defendants cite (at 29) *Chase v. Aimco Props., L.P.*, 374 F. Supp. 2d 196 (D.D.C. 2005) (Robertson, J.), which does not advance their cause.  *Chase* concerned whether, because of a difference between state and federal law, the state law issues might come to predominate over the federal issues (under § 1367(c)(2)).  *Id.* at 202.  That court was emphatically not considering "novelty" or "complexity" under § 1367(c)(1).  Moreover, there, the court identified an actual potential difference between state and federal law (the standards governing legality of the defendant's "adjustable work week" policy) that it believed might cause the state law claims to predominate in that lawsuit.  *Id.* at 202.  Defendants have not identified any such similar issue here.  Finally, even if *Chase* were relevant, at this point it is questionable authority at best, as it was decided prior to the D.C. Circuit's decision in *Lindsay*, and it relied heavily on the district court decision in *Lindsay* that was later reversed.  See *id.* at 201-02.

> **2.    The Maryland law claim will not substantially predominate over the FSLA claim.**

Defendants argue (at 30-31) that plaintiffs' state law claim will predominate because the Rule 23 class is likely to be larger than the § 216(b) FLSA class.  But they misconstrue the predomination requirement.  Predomination concerns the nature of the claims, not the number of individuals who may assert those claims.  Here, there is no risk of predomination because the legal and factual issues presented by the state law and federal law claims are in all relevant respects identical.  See *Lindsay*, 448 F.3d at 425 ("Predomination under section 1367(c)(2)

relates to the type of claim and here the state law claims essentially replicate the FLSA claims –

they plainly do not predominate.").  And, the purely numerical assessment of class size that

defendants offer as the standard for predomination is simply not the type of predominance

contemplated by § 1367(c)(2).  See *Gibbs*, 383 U.S. at 726-27; *Lindsay* 448 F.3d at 425.

As support, defendants rely on *DeAsencio* v. *Tyson Foods, Inc.*, 342 F.3d 301 (3d Cir.

2003).  But that court too recognized that "[p]redomination under section 1367 generally goes to

the type of claim, not the number of parties involved."  *Id*. at 311.  While it did go on to conclude

that at some point "the disparity in numbers of similarly situated plaintiffs *may be so great* that it

becomes dispositive by transforming the action to a substantial degree," it acted only *after* the

opt-in period had closed, and the resulting FLSA class contained only 447 members while the

state law class contained 4,100.  *Id*. at 304, 311.

Here, by contrast, there is no evidence that a disparity of that magnitude will occur when

the opt-in class under the FLSA is compared to the opt-out class under Maryland law.  Notices

have not yet even been mailed.  And it is by no means self evident, as defendants suggest, that

the opt-in and opt-out classes will be of substantially different sizes.  In *Lindsay*, for instance, the

two classes were approximately the same size.  448 F.3d at 425.  And here, the Maryland state

law class may be *smaller* than the FLSA opt-in class, because the Maryland class will include

*only* those InterSolutions employees to whom Maryland law applies, whereas the FLSA class

will include individuals who did their primary work in either the District of Columbia, Maryland,

or Virginia.

Finally, defendants state without any basis that "this court may be faced with applying

two separate tests to determine a single class member's exempt status," referencing the 2004

revision of Department of Labor standards for determining whether employees are exempt from

the FLSA overtime requirements.  As a matter of fact, defendants themselves have classified the

class members as "non-exempt."  See InterSolutions' Policies and Expectations Handbook at 9

(for the position held by the class members, compensation status was "Non-Exempt/Hourly –

Position is eligible for overtime") (Exhibit hereto).  That fact conclusively refutes defendants'

claim to the contrary, and at a minimum raises a factual issue precluding dismissal at this stage.

Further, the class is defined to include only hourly-paid employees (Amended Complaint ¶¶ 18,

42, 49), who are always non-exempt employees and entitled to overtime pay.  See *Reich* v.

*Waldbaum*, 52 F.3d 35, 41 (2d Cir. 1995) ("employees compensated on an hourly basis are

subject to the FLSA"); *Estanislau* v. *Manchester Developers, LLC*, No. 3:02cv1515, 2003 U.S.

Dist. LEXIS 23763, at *17 (D. Conn. Dec. 23, 2003) ("Plaintiff was paid on an hourly basis, and

accordingly as a matter of law he cannot be considered an exempt employee under the FLSA.").

There are therefore no exemption issues in this case

> ### 3.     The Maryland law claim does not present other compelling reasons to decline jurisdiction.

None of defendants' remaining arguments represent the type of "other compelling

reasons" to decline jurisdiction "in exceptional circumstances" contemplated by 28 U.S.C. §

1367(c)(4).

> #### a.     This Circuit has rejected the argument that FLSA collective actions and state law class actions are "inherently incompatible."

As noted above, *Lindsay* rejects defendants' argument that opt-in and opt-out classes

relating to different claims in a single action are "inherently incompatible."  The cases on which

defendants rely are not controlling authority in this Circuit.  And, as discussed above (at n.1),

many courts have rejected defendants' position.  But most importantly, the D.C. Circuit has

rejected it.  See *Lindsay*, 448 F.3d 416.  In *Lindsay*, the court reversed the District Court's refusal

to certify a state-law class action, *requiring* the District Court to hear state-law claims unless "exceptional circumstances" and "other compelling reasons" counseled against doing so. *Id*. at 424. Even more importantly, it stated that the differences between the opt-in and opt-out procedures *could not* constitute a "compelling reason" in an "exceptional circumstance." *Id*. at 425.

> **b.    Defendants' assertion of "unacceptable complexities" provides no basis for declining jurisdiction.**

Defendants claim (at 33) that the Court should decline to exercise jurisdiction over the state class claimants that do not opt in to the FLSA class because doing so would present "unacceptable complexities." Because that is not a permitted basis under 28 U.S.C. § 1367(c) for a court to decline to exercise supplemental jurisdiction, we take this argument to be an assertion that the Court should not hear this case under the "other compelling reasons" in "exceptional circumstances" rationale of § 1367(c)(4).

This argument should be rejected because, as discussed above, it is foreclosed by *Lindsay*. Defendants' reliance on *Chase* is misplaced. *Chase* was decided prior to the D.C. Circuit's decision in *Lindsay*, and explicitly relied on the lower court decision in *Lindsay* that was later overturned. See 374 F. Supp. 2d at 201-02. Further, the "unacceptable complexities" that the defendants assert relate to the purported incompatibility of opt-in and opt-out actions. As discussed previously, *Lindsay* instructed that a District Court "may not use subsection (c)(4) to conclude that section 216(b)'s opt-in provisions ousts the court of supplemental jurisdiction over the state law class." 448 F.3d at 425.

> **c.    The FLSA does not "expressly preempt" the state-law class action.**

Defendants' argument (at 4) that the "Maryland state overtime class action claim under Rule 23 … is expressly preempted by the opt-in requirements in the FLSA," can be easily

rejected.  They point to no language in the FLSA providing that state-law unpaid overtime claims may not proceed in an action where an FLSA claim is alleged.  The courts in all of the cases cited above (at n.1) certainly allowed both such claims to proceed at once.  And in *Lindsay*, the D.C. Circuit flatly rejected this argument, finding that § 216(b) does not provide an "express prohibition" on state law overtime claims.  448 F.3d at 422.  In addition, the D.C. Circuit noted that the FLSA can be contrasted with "other legislation in which the Congress has *expressly* prohibited federal courts from exercising supplemental jurisdiction over state law claims."  *Id.* The FLSA provides no such prohibition, and therefore defendants' "express preemption" argument should be rejected.  See also *Bahramipour*, 2006 U.S. Dist. LEXIS 9010, at *9-12 (rejecting preemption argument); *Takacs* v. *A.G. Edwards & Sons, Inc.*, 444 F. Supp. 2d 1100 (S.D. Cal. 2006) (same).

> ### d.    Defendants' concerns about *res judicata* do not present other "compelling reasons" or "exceptional circumstances."

Defendants cannot seriously contend that concerns about *res judicata* provide grounds for dismissal of the Maryland law claims.  While it is true that a judgment on the class claims would preclude an individual who neither opts into the FLSA class nor opts out of the Maryland class from later litigating those claims, that point is irrelevant at this stage.  Many class action cases in federal court present that same issue.  That is why class members can opt out of Rule 23(b)(3) class actions.  Surely concerns that arise in any class action do not present "other compelling reasons" or "exceptional circumstances" for declining supplemental jurisdiction of the state law claims here.  Were the overtime claims in this case re-filed as a class action in Maryland state court – where it certainly could proceed – there would be exactly the same *res judicata* consequences that would attach if they are allowed to proceed in this federal action.  And

Maryland class members will have the same right to opt out in this lawsuit as they would in an action in Maryland state court.[2]

The defendants would like to assert that these state-law overtime claims are different because Congress has made a different policy determination for federal FLSA wage and hour claims. For this type of claim – a Maryland state-law wage and hour claim – it is the State of Maryland, not the U.S. Congress, that determines whether to require an opt-in scheme for Maryland state-law class action claims. While Congress has made the policy judgment not to allow opt-out class actions under the FLSA, the State of Maryland has made no such similar policy judgment. Whichever scheme is wiser, there are no affirmative opt-in requirements under the Maryland law.

In support of their argument, defendants again rely on *Chase*. But, as discussed, that case was decided *before* the D.C. Circuit decided *Lindsay*, and its holding rests on grounds that were explicitly rejected in *Lindsay*, *i.e.*, that the Court could decline supplemental jurisdiction under 28 U.S.C. § 1367(c)(4) based on the incompatibility of opt-in and opt-out classes. *Id*. at 202. Defendants' argument here should similarly be rejected.

## II.    PLAINTIFFS' STATE-LAW CLASS ACTION WILL, AT THE APPROPRIATE TIME, MEET THE "SUPERIORITY" REQUIREMENT OF RULE 23(B)(3).

Defendants prematurely ask the Court to dismiss plaintiffs' state law class claims now on the basis that the plaintiffs cannot – as a matter of law – meet the "superiority" requirement.

---

[2]    Defendants assert incorrectly that the FLSA's requirement that class members opt in, added by the Portal-to-Portal Act of 1947, is a protection accorded to employees. To the contrary, the Portal-to-Portal Act of 1947 was enacted primarily to protect *employers*, freeing them "of the burden of representative actions." *Hoffman-La Roche, Inc.* v. *Sperling*, 493 U.S. 165, 173 (1989). To the extent it was meant to protect *employees*, its purpose was to ban actions brought by *non-employees* on behalf of employees with no knowledge of the litigation. See *United States* v. *Cook*, 795 F.2d 987, 992-93 (D.C. Cir. 1986).

Initially, this issue is best considered in the context of a motion for class certification, which will be filed with this Court as soon as is practicable. There, the merits of certifying the Rule 23 class for the Maryland state law claims can be considered in full, rather than in isolation.

Even so, it is already clear that permitting the Maryland state law claims to proceed on a class basis is "superior to other available methods for the fair and efficient adjudication" of the claims of the Maryland subclass because the other "available methods" for adjudication of these claims are a separate class action in state court or a series of many individual actions. *E.g., Trinidad*, 2007 U.S. Dist. LEXIS 2914, at *25 ("permitting New York Labor Law claims to proceed as Rule 23(b)(3) class actions, along with FLSA collective actions, is a superior method"). Requiring parallel actions in the courts of two jurisdictions for virtually identical claims is plainly not a superior method of adjudication. Parallel actions would, amongst other concerns, needlessly waste resources and raise the risk of inconsistent adjudications.

Neither of defendants' arguments to the contrary support a different result. First, defendants contend (at 24) that "a class action under Rule 23(b)(3) is not the superior method to adjudicate Plaintiffs' claims because Congress has specifically set forth a superior method for adjudicating the claims under 216(b) of the FLSA." This point thoroughly conflates plaintiffs' FLSA claims with plaintiffs' Maryland state-law claims. Congress has provided a method for adjudicating only the FLSA claims. Its policy decision regarding the procedures for pursuing those claims says nothing about whether a class action is a superior method for pursuing Maryland state-law overtime claims. The Court cannot graft § 216(b) onto the plaintiffs' state law claims.

Defendants next argue (at 25) that a class action is "not a superior method because it creates confusion among potential plaintiffs," as it will allegedly be impossible to draft clear

class notice. This argument is both premature and wrong. At the point a class is certified, the parties will, as the Court determines, draft either easy-to-understand class notices for the Maryland law class and the FLSA class, or a single notice. Counsel and the Court can collectively draft appropriate notices, defendants' pessimistic predictions notwithstanding.

Further, the mere potential for confusion does not make forcing plaintiffs to pursue their state law class claims in a separate action in state court, or forcing the class members to individually litigate their state law claims, a "superior . . . method[] for the fair and efficient adjudication" of those claims. In this instance, the defendants' "cure" is far worse than the "disease."

Finally, if there is potential for confusion from issuing a notice explaining the opt-in and opt-out claims in this case, that potential for confusion is greater – not lesser – if the state law action must commence in state court, necessitating different notices issuing from different courts in different jurisdictions.

For all of these reasons, the Court should reject defendants' superiority argument.

## III.    THE COURT SHOULD ALSO REJECT DEFENDANTS' ARGUMENT CONCERNING THE RULES ENABLING ACT.

As a final, throw-it-all-in argument, defendants claim (at 35-37) that allowing a state law class claim would limit the substantive rights of those who do not opt in to the collective action, in violation of the Rules Enabling Act, 28 U.S.C. § 2072(b). This argument is contrary to controlling authority in this Circuit, legally unsupported, and wrong on the merits.

Initially, in asserting this argument, defendants continue to ignore *Lindsay*, discussed at length above, in which the D.C. Circuit was "not persuaded" by defendants' basic argument that a state law class certified under Rule 23 and an FLSA class under § 216(b) could not coexist in

14

the same action. 448 F.3d at 422. That is the controlling law, and it alone requires the Court to reject all of defendants' assertions to the contrary.

Second, as defendants admit, their argument is also legally unsupported, and they fail to cite a single case in which a court dismissed a state law class claim on these grounds. See Def. Brief at 37 ("courts have not address this specific issue"); see, *e.g.*, *DeAscencio* v. *Tyson Foods, Inc.*, 342 F.3d 301, 310 (3d Cir. 2003) (no mention of 28 U.S.C. § 2072(b)); *LaChappelle* v. *Owens-Illinois, Inc.*, 513 F.2d 286, 289 (5th Cir. 1975) (same); *Lee* v. *Vance Exec. Protection, Inc.*, 7 Fed. Appx. 160, 2001 U.S. App. LEXIS 1849 (4th Cir. 2001) (same).[3] The Court should reject defendants' effort to piece together inapposite authority in order to fashion an argument that no court has accepted.

Finally, even if the Court were to ignore Circuit authority and indulge defendants' creativity to consider the merits of this argument, the Court should reject it. The basic premise of the argument – that opt-in rights under § 216(b) are "substantive" rights protected from abridgment by the Rules Enabling Act – is simply wrong. Once again, the D.C. Circuit in *Lindsay* found the difference between the opt-in requirement of the FLSA and the opt-out requirement of Rule 23 to be "a mere *procedural* difference." 448 F.3d at 424. This is logical, as although the different procedures impact the process for determining who is part of an action,

---

[3]     Recognizing that there is no support for their argument, defendants resort to citing a *amicus* brief filed by the Department of Labor in *Long John Silver's Restaurants, Inc.* v. *Cole*, No. 06-1259 (4th Cir.). The decision of the District Court in that action upheld an arbitrator's decision to certify an opt-out class under the FLSA because the parties' agreement so required. See 409 F. Supp. 2d 682 (D.S.C. 2006). That decision did not concern whether or not the opt-in requirement under the FLSA is a substantive requirement. And, the issue arose in that case because the Department of Labor claimed that the substantive protections of the FLSA had not been properly applied by the arbitrator. It did not consider whether § 216(b) was "substantive" for purposes of the Rules Enabling Act.

the procedures alone do not dictate the outcome of the action.[4]  The Court should therefore reject this argument as well.

## **CONCLUSION**

For the reasons stated above, defendants' Motion to Dismiss Count II of Plaintiffs' Amended Complaint should be denied.

Dated: February 8, 2007

Respectfully submitted,


_____//s//_____
Thomas J. Mikula (D.C. Bar No. 396105)
Adam M. Chud (D.C. Bar No. 468443)
Sarah S. Keast (D.C. Bar No. 493632)
Goodwin Procter LLP
901 New York Avenue, N.W.
Washington, D.C.  20001
Tel.: (202) 346-4000
Fax:  (202) 346-4999


Susan E. Huhta (D.C. Bar No. 453478)
Carolyn P. Weiss (D.C. Bar No. 480697)
Washington Lawyers' Committee for
   Civil Rights and Urban Affairs
11 Dupont Circle, N.W., Suite 400
Washington, D.C.  20036
Tel.: (202) 319-1000
Fax:  (202) 319-1010

*Counsel for Chanel Cryer, James Byrd,*
*Jonathan Cashwell, and Marc Inman*


LIBW/1620328.3

---

[4]     Further, this argument is in fact nothing more than another way of claiming that anyone who fails to opt in to the FLSA class, but remains part of the state law class, may have his or her FLSA rights determined anyway under principles of *res judicata*.  That issue is addressed at length previously in this Opposition.

# POLICIES

# AND

# EXPECTATIONS

1

# WEEKLY TIMESHEETS AND PAYCHECKS

*To ensure accurate and prompt paychecks, please adhere to the following procedures: at the end of each work week (or each assignment if an assignment is less than one week in duration), please have your time sheet signed by your on-the-job supervisor and fax it to the InterSolutions office at (202) 546-7737, by Monday at 12 pm. The InterSolutions work week runs from Monday through Sunday.  Paychecks are issued biweekly on Fridays.*

# PAY RATES

*Each InterSolutions assignment pays a specific hourly pay rate, which is explained to you at the beginning of each assignment.  Pay rates vary from assignment to assignment.   Some assignments may offer bonuses.  If your employment with InterSolutions is terminated or should you resign for any reason, you will not be eligible for payment on any outstanding bonuses.*

# TERMINATION

*Once you have been hired at InterSolutions you will become an integral part of our team.  As a representative of InterSolutions we ask you to always act and perform in a professional manner; respecting yourself as while as others around you, and show good judgment while working at InterSolutions' client sites. Always remember that the InterSolutions internal staff is here to help you lay your career path. Therefore, you should respect them all as your supervisors and professionals. Your employment relationship can and will be terminated for the any following:*

> *Two InterSolutions clients asking for you to not return to their work site.*
> *No call/No show (not showing up for assignment without notifying InterSolutions).*
> *Displaying unprofessional behavior towards employees, clients, and InterSolutions' internal staff.*

# TERMINATION OF ASSIGNMENT NOTICE

*Once you have accepted an assignment, we expect you to keep us informed of all important information regarding your assignment. As a representative of InterSolutions, we request that you contact us three working days before you terminate any assignment.  If you fail to notify InterSolutions at least three working days before you terminate an assignment or if you "walk-away" from any InterSolutions assignment, your pay rate for your workweek will automatically be reduced to the legal minimum wage. The same penalty will apply if you fail to notify InterSolutions that your assignment is complete or has been terminated by the client company.*

*Always call the InterSolutions office if there is a question or problem regarding an assignment. Remember you are an InterSolutions Employee who should always report to the InterSolutions Staff.*

2

# NOTIFICATION

Please call InterSolutions whenever any of the following situations occur:
- ➤ Your assignment is completed (your failure to do this within 72 hours will result in your being dropped from InterSolutions payroll as a "voluntary quit").
- ➤ Your assignment is extended longer or ends earlier than scheduled.
- ➤ You will be late or absent from your scheduled assignment, or you leave the job early.
- ➤ Whenever you will be unavailable for an assignment (please tell us when you expect to be available again.)
- ➤ You wish to be replaced on an assignment or to be reassigned to another.
- ➤ Our client expresses an interest in hiring you for a permanent position (we will make all necessary arrangements with the client).

# HOLIDAY PAY

InterSolutions consultants who have been paid for working a total of 500 hours over any period of time and work through the week of the holiday (at least 4 days) are eligible for paid holidays. Holiday pay is for 8 hours and is equal to the average hourly pay rate you received for the days you worked during the holiday week. The holidays for which you are eligible to be paid are:

New Years Day, Easter, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day

# GENERAL POLICIES

No employee is allowed at any time to authorize vehicles for towing from the community without the direct authorization of the Property Manager. Notification of parking violations may be issued, however, they are to be warnings only.

Packages at the front desk MUST be logged in on any shift they are received. Residents arriving for pick up must sign for; show I.D. and the slip from the deliverer. DO NOT ISSUE packages without proper Identity verification. Anyone doing so will be held personally responsible for the package. Place your initials next to the package that you are logging in.

All shifts are to brief the following shift of what is going on. We are should be very considerate of our colleagues and make sure not to leave them in the dark.

The front desk area should stay CLEAN at all times. You are on the front line and it is a poor picture to paint if the area is dirty and cluttered with unnecessary papers, books, etc.

Write down telephone messages in the message book. Message books will be placed at the front desk. All messages must be received in the appropriate manner. Messages on pieces of paper are not only unacceptable, but they are unprofessional.

Cigarette breaks cannot be taken without the authorization or proper coverage of the office or any employee on staff.

3

# PAYCHECKS

*Your paychecks are processed based on the timesheets we receive.  If you do not turn in your timesheet, you will not get paid.  It is our goal to get your check to you as quickly and accurately as possible. Please follow these guidelines to ensure that you receive your paycheck on time.*

❖ *Fill out your timesheet COMPLETELY.  Timesheets must have your name, client name, hours worked and proper signatures. We cannot process timesheets that do not have required signatures.*

❖ *One client per timesheet.*

❖ *One workweek per timesheet.  Workweeks run Monday through Sunday.*

❖ *Holiday hours should not be written on timesheets.*

❖ *Timesheets that have not been received via mail or fax will not be processed.*

❖ *All timesheets must be received by Monday @ 12 pm.*

❖ *Payday is biweekly on Fridays.*

*We greatly appreciate your cooperation to ensure the accurate and efficient processing of your paychecks.*

### Please call us with any questions.

4

# BACKGROUND

# INTRODUCTION

### What is a concierge?

A concierge controls the front desk and offers superior customer service to everyone who enters the building

### What is the purpose of a concierge?

A concierge ensures that the expectations of current residents are exceeded; and that new customers are treated like current residents

### Which industries include concierge positions?

Hotel / Hospitality and Property Management

# PROPERTY MANAGEMENT INDUSTRY

### Categories of employees

- ➢ *Concierge*
- ➢ *Office*
- ➢ *Maintenance*

### Types of properties with concierge positions

- ➢ *Luxury High-Rise Buildings*
- ➢ *Mid-Rise Buildings*

# WHAT TO EXPECT WORKING AS A CONCIERGE

### Gate Keeping

*Gate Keeping ensures that only residents and approved visitors are allowed to enter the building. Contractors and vendors must sign in and show a valid photo ID. In order for contractors or vendors to enter an occupied apartment, there MUST be a SIGNED letter from the resident giving that specific contractor or vendor permission to enter the apartment*

### Leasing Inquiries

- ➢ *Have the customer (i.e., "prospective resident") "make them-selves comfortable", NOT "have a seat"*
- ➢ *Offer refreshments*
- ➢ *Prepare a guest card*
- ➢ *Notify a leasing consultant*

6

## *Resident Services*

> ➢ *Issuance of guest parking permits*
> ➢ *Package delivery*
> ➢ *Newspaper delivery*
> ➢ *Setting up breakfast bar*
> ➢ *Pet-sitting*

# POSITION DESCRIPTION

Case 1:06-cv-02032-EGS Document 16-2 Filed 02/08/2007 Page 8 of 20

**_Report to_:**    Front Desk Manager

**_Compensation_:**    Non-Exempt / Hourly
Position is eligible for overtime.

# _Qualifications:_

Education    *No specific level of education is required. However, the position does require the ability to read and write English fluently, and the ability to effectively communicate with people both verbally and written.*

Experience    *Generally, no previous work or property management experience is required.*

Skills
- *Excellent verbal and written communication skills*
- *Ability to read and write English fluently*
- *Creative, craft-oriented abilities*
- *Strong listening skills and patience*
- *Strong customer service representation*
- *Strong organizational abilities*
- *Professional image*
- *Assertiveness*
- *Ability to function as a team player*
- *Very personable*

Licenses    *No specific license is required for this position.*

Training    Generally, no prior training is required. However, past experience in    customer relations is recommended.

9

# Essential Job Functions

## General

> *Ensure the physical condition of the front desk area is neat and organized.*
> *Develop, refine and effectively implement excellent telephone and personal skills.*
> *Respond to the needs of residents.*
> *Maintain company customer service standards. Respond to resident requests and work with residents to minimize and resolve resident problems and complaints. Follow through to ensure issues are resolved.*
> *Clearly and effectively communicate with residents, other employees, vendors and supervisors in written and verbal form.*

## Attendance

> *You are required to report for work on time and to work all scheduled hours and any required overtime.*
> *It is a condition of employment that you arrange dependable transportation to the job.*
> *Excessive tardiness and/or absenteeism, even with acceptable explanations for absence/tardiness, are subject to disciplinary action up to and including immediate discharge at the sole discretion of the Company.*
> *The Company reserves the right to determine what constitutes excessive tardiness and/or absenteeism. In reviewing absenteeism and tardiness, the Company will not consider leaves of absence granted under the Family and Medical Leave policy or those granted as an accommodation for a disability.*
> *You must notify your front desk manager at least <u>one hour</u> prior to your scheduled start time if you will not be able to report to work as scheduled.*
> *You must contact and speak with your front desk manager (or other designated persons as assigned by your Manager). Leaving a message with the answering service or a co-worker when calling is not sufficient.*
> *If you are unable to call in yourself due to an emergency situation, you should have someone call in on your behalf. You should then personally follow up with your Manager as soon as practical.*
> *An associate who fails to report for two (2) consecutive scheduled days will be considered to have abandoned his/her job (voluntarily quit) and will not be eligible for rehire.*
> *You must report to your Manager after being late or absent, give an explanation of the circumstances surrounding your tardiness or absence and, when applicable, certify that you are able to return to work.*
> *Absences of three (3) or more days may require a doctor's note prior to returning to work.*
> *You must obtain your Manager's prior approval to leave Company premises during working hours.*
> *The position requires the ability to work any of the 7 days of the week, 52 weeks of the year.*
> *Due to the property staffing limitations, it is extremely critical that associates be able*

11

to work their scheduled hours on a consistent basis, and if necessary, overtime hours when requested.
- It is also important that individuals are flexible with scheduling to provide appropriate coverage.

## Time Records

- You are responsible for the accuracy of your own time records (punching in and out).
- You are not to punch in and out for another associate.
- Associates who punch in and out for other associates may be subject to discipline, up to and including immediate termination.
- Once your scheduled relief associate has punched in, you are required to punch out immediately. If you fail to punch out, your time sheet will reflect the time up to your relief's punch in time.

## Overtime

- It is expected that associates will work overtime when requested.
- Overtime is paid to non-exempt associates and must be authorized in advance by the Front Desk / Community Manager.
- Non-exempt associates are paid at time and one-half of their base hourly rates when they physically work over 40 hours in the workweek.
- If you work less than forty (40) hours Monday through Sunday, you are not entitled to overtime regardless of the number of hours worked in any one day, unless required by state or local law.
- Only hours actually worked are counted towards overtime, thereby excluding vacation, personal time off, bereavement, jury duty, Company-paid holidays, etc.
- For example, your weekly time record indicates 35 hours were actually worked and 8 were taken as holiday. Since actual hours worked did not exceed 40, all of the hours (43) would be paid at the straight-time hourly rate.
- If your weekly time record had shown that 44 hours were actually worked and 8 were taken as holiday, four hours would be paid at time and one-half, and the remaining 48 hours would be paid at the straight- time rate.

## Emergency and Safety Information

- Prepare and practice an emergency plan for the building in cases of emergency or evacuation.
- Understand what constitutes an emergency situation.
- Adhere to the Company's safety programs, policies and procedures.
- Maintain a safe environment for the on-site staff and residents.

12

*Safety Tips:*

> ➤ *Keep all keys in proper cabinets and drawers*
> ➤ *Never leave keys unattended*
> ➤ *Never give keys out without proper identification*
> ➤ *Never give out a resident's address, name, or phone number*

13

# *SAMPLE FORMS*
## *FRONT DESK ASSOCIATES*

### DELIVERY NOTICE

DATE _____

NAME _____ APT. _____

WE ARE HOLDING FOR YOU:

_____ PACKAGE AT THE DESK

_____ FED EXP/EXP. MAIL

_____ SPECIAL DELIVERY

_____ OTHER

_____

CLERK _____

**Package Slip**



**Service Request**

14

| APT. NO. | RESIDENT NAME | SERVICE NEEDED | TIME | DATE | REC'D BY | PHONE NUMBER |
|---|---|---|---|---|---|---|
| | | | RECEIVED | | | |

ARCHSTONE

**COMMUNITY MANAGEMENT SERVICE REQUEST**

528027

Dear Resident:

☐ Your Service Request has been completed. Should you have any questions or need further assistance, please call or come by the leasing office. THANK YOU.

☐ Your Service Request has not been completed.

The reason for the delay is: _____

We anticipate the work will be completed by: _____

We try to complete all Service Requests within 24 hours. We apologize for the delay. If you have any questions or need further assistance, please call or come by the leasing office.

Thank you for your patience in this matter.

**SPECIAL INSTRUCTIONS:**

_____

_____

**SERVICE REQUESTED:**

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**WORK PERFORMED:**

_____

_____

_____

PERFORMED BY _____ DATE _____

WORK PERFORMANCE FOLLOW UP: _____

_____

**FILE COPY**

Service Request (aka Work Order)

15

# PROFESSIONALISM

16

# DRESS CODE

*The InterSolutions, Inc. dress code is designed to promote a professional image of our on-site staff. The following guidelines have been established to ensure that the chosen accessories are consistent with the overall goal of the apparel program:*

### General Guidelines – All Associates

- *All clothing items should be neatly pressed.*
- *Hair is to be neat and well groomed. Unnatural hair colors are unacceptable (i.e. blue, purple, etc.).*
- *Decorative jewelry pins are not appropriate.*
- *Shoes must be well kept and in good condition.*
- *Oversized belt buckles are not appropriate.*
- *Fingernails should not exceed 1/4" in length from end of fingertips and should be well groomed.*

### General Guidelines – All Female Associates

- *Skirts/walk shorts may be no more that 3" above the knee.*
- *Blouses should be business in style and in white, cream, or ivory colors only. No plunging or revealing necklines.*
- *Coordinating scarves may be worn in a neat and conservative knot.*
- *Hosiery must be worn and coordinated with the outfit. However, it is limited to the following colors: nude, ivory, white, black, and navy. Fishnet hosiery or hosiery with seams or rhinestones is unacceptable.*
- *Simple pumps, loafers, or dress flat shoes with no more than a 2" heel are the standard.*
- *Acceptable colors include black, navy, taupe, or cream. Shoes must be well kept and in good condition.*
- *All jewelry and accessories must be conservative and limited to one or two strands of pearls or simple gold or silver necklace and earrings. Earrings are limited to two per ear as long as one per ear is a stud. Rings are limited to two per hand (wedding/ engagement ring sets are considered one ring). Large hoops or dangles are not appropriate.*
- *If nail polish is desired, it should be a neutral color or of the red base color, appropriate for a business office. Nail jewelry or nail art is unacceptable.*
- *Appropriate base garments should be worn. These include slips, camisoles, etc.*

### General Guidelines – All Male Associates

- *Dress shirts should be long-sleeved, cotton, button down, in white or blue only.*
- *Ties must be worn with coordinated colors to compliment the jacket or sport coat. Thin bolero or thin width ties are not acceptable. Ties with cartoon characters or other comic statements are not suitable.*
- *Loafers or lace-up shoes in black, brown, or burgundy are acceptable footwear. Cowboy boots, sneakers of any color, or steel toes are not acceptable.*
- *Socks must always be worn. Calf-length, conservative socks to coordinate with the color of the slacks or shoes are acceptable. White socks are not permissible.*

17

- *Men must be either clean-shaven or wear beards and/or mustaches that are neatly trimmed.*

# *TELEPHONE TECHNIQUES*

*The telephone is a very important tool in the Front Desk position. Phone callers will usually call for two main reasons: 1) to inquire about leasing or 2) to submit a service request. If they are inquiring about leasing while the office is open, ask them to please hold and you will transfer them to a leasing consultant. If the office is closed, then take a message and tell the caller that a leasing consultant will call them back when the office opens again.*

*As for service requests, make sure that you write down all of the pertinent information. Include the following: resident's name, address, phone number and the nature of the maintenance problem. Sometimes the caller will understandably be upset about their maintenance concern. It is important to remember to remain calm, cool and collect and to empathize with the caller's needs. If it is a maintenance emergency during office hours, contact and inform a member of management. For maintenance emergencies after office hours, contact the on-call maintenance technician.*

**There are four parts to every phone call:**

**Greeting**
- *Answer the phone within 2 rings*
- *Smile (YOU CAN HEAR IT!!)*
- *Introduce the community and yourself*

**Information Gathering**
- *Request the caller's name (and use it during the conversation)*
- *Ask how you can help them*
- *Answer every question that you can*

**Problem Solving (Dealing With Irate Customers)**
- *LISTEN! Let them get it off their chests*
- *DO NOT let them verbally abuse you (e.g. cursing or berating)*
- *Let someone in the management office know what is going on*

**Closing**
- *Obtain the caller's phone number if an associate needs to return the call.*
- *Offer directions to the property, if the caller wants to visit.*
- *Thank the prospect for calling.*

# FAIR HOUSING POLICIES

# INTERSOLUTIONS, INC. FAIR HOUSING POLICY

*Our number one responsibility in the housing or property management industry is to provide fair and consistent service to every person we encounter. Therefore, to achieve equal housing opportunities for all people regardless of their race, color, religion, sex, or national origin, familial status or disability, you must make a conscious personal commitment to eliminate bias and prejudice from your thoughts, your actions and from the housing market. This commitment is fulfilled by adherence to procedures that ensure all prospects and residents are given equal professional services.*

## FAIR HOUSING DOS AND DON'TS:

| | |
|---|---|
| *DO* | *be consistent with providing service.* |
| *DO* | *be consistent with how you treat your customers.* |
| *DO* | *document the work that you complete on each and every work order.* |
| *DO* | *refer any disabled person to the property manager if he/she wishes to modify an apartment.* |
| *DON'T* | *Specifically ask if a resident has children; ask how many people live in the apartment.* |
| *DON'T* | *steer anyone to a particular "area" of the community because of race, color, religion, sex, national origin, familial status, or disabled status.* |
| *DON'T* | *be afraid to ask for the resident's needs, wants and desires and try to satisfy those needs.* |
| *DON'T* | *be afraid to say, "I'll find out" if you are not sure of the answer, and ask someone before you offer anything.* |

20