**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHANEL CRYER, JAMES BYRD,      ) <br> JONATHAN CASHWELL, and      ) <br> MARC INMAN,      ) <br> On behalf of themselves and all others  ) <br> similarly situated,      ) <br>          ) <br>       Plaintiffs,      ) <br>          ) <br> v.         ) <br>          ) <br> INTERSOLUTIONS, INC.      ) <br> DREW GOLIN, and      ) <br> SARAH WALDER      ) <br>          ) <br>       Defendants.      ) <br> _____) | Case No. 06-02032 (EGS) |

**PLAINTIFFS' MOTION FOR CONDITIONAL CLASS CERTIFICATION,**
**ISSUANCE OF NOTICE**
**AND AN ORDER FOR CERTAIN DISCOVERY**

For the reasons set forth in the attached Memorandum, Plaintiffs respectfully request, pursuant to 29 U.S.C. 216(b), that this Court:

1) Conditionally certify a class of "all persons who are or have been employed by InterSolutions as temporary employees and who worked more than forty (40) hours during any given work week between November 29, 2003 and the present;"

2) Authorize notice in this action to all members of the above described class; and

3) Order Defendants to produce to Plaintiffs the names and last know addresses of all current and former temporary employees, dating back three years from November 29, 2006.

DATED:  February 16, 2007

Respectfully submitted,


_____//s//_____
Thomas J. Mikula (D.C. Bar No. 396105)
Adam M. Chud (D.C. Bar No. 468443)
Sarah S. Keast (D.C. Bar No. 493632)
Goodwin Procter LLP
901 New York Avenue, N.W.
Washington, D.C.  20001
Tel.: (202) 346-4000
Fax:  (202) 346-4999


Susan E. Huhta (D.C. Bar No. 453478)
Carolyn P. Weiss (D.C. Bar No. 480697)
Washington Lawyers' Committee for
    Civil Rights and Urban Affairs
11 Dupont Circle, N.W., Suite 400
Washington, D.C.  20036
Tel.: (202) 319-1000
Fax:  (202) 319-1010

*Counsel for Chanel Cryer, James Byrd,*
*Jonathan Cashwell, and Marc Inman*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CHANEL CRYER, JAMES BYRD, | ) | |
| JONATHAN CASHWELL, and | ) | |
| MARC INMAN, | ) | |
| On behalf of themselves and all others | ) | |
| similarly situated, | ) | |
| | ) | Case No. 06-02032 (EGS) |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| INTERSOLUTIONS, INC., | ) | |
| DREW GOLIN, and | ) | |
| SARAH WALDER, | ) | |
| | ) | |
| Defendants. | ) | |
| _____) | | |

**MEMORANDUM IN SUPPORT OF MOTION
FOR CONDITIONAL CLASS CERTIFICATION, ISSUANCE OF NOTICE
AND AN ORDER FOR CERTAIN DISCOVERY**

This is an action for unpaid overtime wages under the Fair Labor Standards Act

("FLSA"), 29 U.S.C. § 201 et seq., and the Maryland wage and hour law, Md. Code Ann. Labor

& Empl. § 3-415, brought by Plaintiffs, on behalf of themselves and similarly situated employees

of Defendants.  For the reasons described below and pursuant to 29 U.S.C. § 216(b), Plaintiffs

respectfully request that this Court conditionally certify the FLSA collective action; approve the

issuance of Plaintiffs' proposed notice, attached at Ex. A; and order Defendants to produce the

names and last known addresses of all current and former temporary employees who have

worked for InterSolutions since November 29, 2003.

> **I.**    **Background**

Plaintiffs, Chanel Cryer, James Byrd, Jonathan Cashwell, and Marc Inman, all worked

for Defendant, InterSolutions, Inc., during various periods between 2003 and the present.  *See*

Amended Complaint at ¶¶ 3-6. InterSolutions is a company that provides temporary staffing to area buildings. *See* Amended Complaint at ¶ 17.[1] Plaintiffs, like all members of the putative FLSA class in this case, were or are temporary employees of InterSolutions who were placed in assignments in or around the Washington, D.C. metropolitan area to work on an hourly basis, usually for ten dollars per hour. *See* Amended Complaint at ¶¶ 3-6; Ex. B (Green Decl.) at ¶¶ 3, 24; Ex. C (Inman Decl.) at ¶¶ 3-4; Ex. D (Jones Decl.) at ¶¶ 3-4.

As detailed below, InterSolutions systematically refused to pay overtime to its temporary employees, including Plaintiffs. *See* Amended Complaint at ¶¶ 21-24; Ex. B (Green Decl.) at ¶¶ 10-11, 15, 17-18, 21; Ex. C (Inman Decl.) at ¶¶ 6-10; Ex. D (Jones Decl.) at ¶¶ 6-8; Ex. E (Sample Pay Recs). Because this unlawful conduct was InterSolutions' general practice, it affected a sizable percentage of these temporary employees, who numbered over 400 during the period in question. Ex. B (Green Decl.) at ¶ 22. In addition, all of the decisions about whether overtime was paid and at what rate it was paid were made by defendant Drew Golin, who oversaw the payroll department in the Washington, D.C. office. *See* Amended Complaint at ¶¶ 38-39; Ex. B (Green Decl.) at ¶¶ 8, 10-11.

InterSolutions knew at all relevant times that it owed its temporary employees overtime pay—its unqualified overtime obligations were stated in its employee handbook. *See* Ex. F (Handbook). Nevertheless, InterSolutions not only intentionally withheld overtime pay from these employees but also repeatedly and willfully misrepresented its overtime obligations to its employees during new hire orientation and when employees complained about their unpaid overtime. *See* Amended Complaint at ¶¶ 24, 34; Ex. B (Green Decl.) at ¶¶ 12-13; Ex. C (Inman Decl.) at ¶ 7; Ex. D (Jones Decl.) at ¶ 7; Ex. E (Sample Pay Recs). In fact, in response to such

---

[1] Defendants Drew Golin and Sarah Walder own InterSolutions and are intimately involved in the day-to-day operations of the company. *See* Amended Complaint at ¶¶ 10, 39.

complaints, InterSolutions attempted to deny work to the complaining employees.  *See* Amended Complaint at ¶ 35; Ex. B (Green Decl.) at ¶ 15; Ex. C (Inman Decl.) at ¶¶ 8-9.

As a result of these gross and repeated violations of federal and state overtime laws, Plaintiff Chanel Cryer filed her Complaint seeking damages arising out of Defendants' violations of the FLSA and the Maryland wage and hour law.  *See* Compl.  The Complaint was amended on January 9, 2007, when three others joined Ms. Cryer in making the same allegations.  *See* Am. Compl.

After the filing of the original Complaint but before the filing of the Amended Complaint, Plaintiffs learned that InterSolutions had started sending letters, along with checks, to some of their current and former temporary employees, explaining that "recent events" had caused InterSolutions to review its payroll records and purporting to compensate the employees for unpaid overtime since January of 2005.  *See* Ex. G (Letters) .  Plaintiffs do not know how many temporary employees who were denied overtime pay received such letters and checks. Nor are Plaintiffs able to verify the accuracy of any amounts that were paid out for this time period.  According to these letters, Defendants only alleged a review of payroll records dating back *two* years—until January of 2005—rather than the three years permitted in cases such as this involving willful violations.  Moreover, Defendants improperly took payroll deductions from the second checks.  *See id*.

Plaintiffs now seek certification and notice to ensure that they, and all employees similarly situated, are fully compensated for InterSolutions' overtime violations.

II.    **Argument**

A.    Plaintiffs Satisfy the Requirements for Conditional Class Certification and Issuance of Notice to Putative Class Members

The Fair Labor Standards Act authorizes collective actions in cases such as this, where employees are "similarly situated." Recognizing that individual wage and hour claims "might be too small in dollar terms to support a litigation effort," *McNeil v. District of Columbia*, Civ. Act. No. 98-3142, 1999 U.S. Dist. LEXIS 23388, at * 5-6 (D.D.C. Aug. 5, 1999), the Fair Labor Standards Act permits an employee to pursue a collective action by suing on his own behalf and on behalf of "other employees similarly situated." 29 U.S.C. § 216(b). The "similarly situated" requirement helps ensure "the efficient resolution in one proceeding of common issues of law and fact arising from the same alleged [unlawful] activity." *Hoffman-La Roche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989).

In FLSA cases, courts conditionally certify the collective action class early in the litigation and then later may revisit certification as the case develops. *See Hunter, et al. v. Sprint Corp.*, 346 F. Supp. 2d 113, 117 (D.D.C. 2004) (citations omitted); *Robinson-Smith, et al. v. GEICO*, Civ. Act. No. 01-1340, 2001 U.S. Dist. LEXIS 25516, at *5-6 (D.D.C. Nov. 16, 2001). This early certification is important in FLSA collective actions because class members must affirmatively opt-in, and the statute of limitations continues to run on the unnamed class members' claims until they join the action. *See* 29 U.S.C. §§216(b), 256. For this reason, early notice to the class members is essential. *See Hoffman-La Roche, Inc.*, 493 U.S. at 170 (explaining that the benefits of a collective action "depend on employees receiving accurate and *timely* notice concerning the pendency of the collective action, so that they can make informed decisions about whether to participate") (emphasis added).

At this stage, Plaintiffs are required to make only a "modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law." *Hunter*, 346 F. Supp. 2d at 117; *Robinson-Smith*, 2001 U.S. Dist. LEXIS 25516, at \*5-6. Such a showing is "ordinarily based mostly on the parties' pleadings and affidavits." *Hunter*, 346 F. Supp. 2d at 117.[2]

These requirements are easily satisfied here. All claimants in this case are or were temporary employees of InterSolutions, and were classified by InterSolutions as hourly-paid employees entitled to overtime. *See* Ex. F (Handbook). All claimants in this case were denied overtime for their temporary assignments in the Washington, D.C. metropolitan area. All claimants allege that Defendants chose not to pay their employees at the legally required rate, and that this practice was a systematic and willful denial of overtime pay.

This Court has looked to two similar tests to determine whether FLSA claimants are "similarly situated." In *Hyman v. First Union Corp., et al.,* 982 F. Supp. 1, 3-5 (D.D.C. 1997), this Court considered three categories:

> The first set of factors involve an examination of the alleged activities of defendant. If there is evidence that the alleged [misconduct] was part of a[n] institution wide practice, such evidence would support the use of a collective action. . . . The second group of factors evaluate the similarities of members of the proposed collective action. Weighing very strongly in favor of a collective action is the fact that the challenged employment practice . . . is the same for each of the members. . . . The third group of factors involve the extent to which members of the proposed action will rely on common evidence to prove the alleged [misconduct].

982 F. Supp. at 3-5. *See also Robinson-Smith*, 2001 U.S. Dist. LEXIS 25516, at \*6 n.4 (adopting the *Hyman* test in an FLSA action).

---

[2]    At this stage of the litigation, the Court "need only reach a preliminary determination that potential plaintiffs are 'similarly situated,'" *Hoffman et al. v. Sbarro, Inc.*, 982 F. Supp. 249, 261 (S.D.N.Y. 1997), which is a less stringent standard than that used during the ultimate determination that the class is proper. *Jackson v. New York Telephone Co*., 163 F.R.D. 429, 431 (S.D.N.Y. 1995).

Similarly, in *Hunter*, the court employed a three-part test, assessing whether all class members worked in the same department, division, and location; whether they advanced similar claims; and whether they sought substantially the same form of relief. *See Hunter*, 346 F. Supp. 2d at 119 (relying on *Lockhart v. Westinghouse Credit Corp.*, 879 F.2d 43, 51 (3d Cir. 1989), *overruled in part on other grounds by Hazen Paper Co. et al. v. Biggins,* 507 U.S. 604 (1993)).

Under either test, Plaintiffs and proposed class members are similarly situated. First, Plaintiffs have alleged that Defendants engaged in a practice and course of conduct of that systematically denied their temporary employees overtime pay at a rate of one-and-a-half their regular rate of pay. This practice was implemented through the payroll division of the Washington, D.C. office, which was and is run by Defendant Drew Golin. Defendants' conduct satisfies the first *Hyman* factor, which corresponds to *Hunter's* assessment of the similarity of the claims. *See Hyman*, 982 F. Supp. at 3 (finding the first factor satisfied and discussing evidence of an "institution wide practice" based on a "centralized decision-making process").

Second, Plaintiffs and proposed class members share strong similarities, satisfying the second *Hyman* factor. This factor—the similarities of the members of the proposed collective action—relies heavily on the fact that there is a common challenged employment practice. *See* 982 F. Supp. at 4. This factor relates both to *Hunter's* "similar claim" element and its "same corporate department, division and location" element. All potential class members are temporary employees who were paid by the hour to provide temporary services in and around the Washington, D.C. metropolitan area. Each was also classified by Defendants as entitled to overtime compensation. *See* Ex. F (Handbook). *See also Hyman*, 982 F. Supp. at 4-5 (stating that the fact that the proposed class members worked at various client sites in the "discrete geographical area limited to the two neighboring states of Maryland and Virginia and the D.C.

area" supports a finding that the conduct emanates from similar circumstances). Moreover, all Plaintiffs and class members allege that they were not paid at a rate of time-and-one-half their regular rate of pay for hours worked in excess of 40 in a given week. Other than the amount of overtime pay due to each class member, there are no variations in the class members' individual claims. *See Robinson-Smith*, 2001 U.S. Dist. LEXIS 25516, at *7 (stating that possible variations in individual damage claims do not defeat class certification and noting that individual loss calculations can "readily be determined later on an individual basis").

Third, common evidence will be used to demonstrate the unlawful conduct at issue, satisfying the third *Hyman* factor. As explained above, the evidence in support of this case falls into four main categories, which are relevant to all class members: 1) payroll records; 2) testimonial evidence from employees who worked in InterSolutions offices, Plaintiffs, and class members; 3) letters and checks InterSolutions issued to class members after this litigation began; and 4) the InterSolutions employee handbook along with any other relevant company policies or procedures.

Finally, Plaintiffs and the proposed class members seek the same form of relief, satisfying the remaining consideration discussed in *Hunter*. For these reasons, Plaintiffs meet all of the elements of the *Hunter* test as well.

Further, the evidence submitted with this motion to establish these facts is more than sufficient to support conditional certification of the collective action at this stage: 1) affidavits from former hourly-paid temporary employees of InterSolutions and from a former manager of InterSolutions; 2) InterSolutions' employee handbook, which states the company's unqualified overtime obligations to its temporary employees; 3) payroll records reflecting unpaid overtime;

and 4) Defendants' own letters and checks to current and former employees admitting systemic unpaid overtime.

B.    <u>Issuance of the Notice Is Appropriate at This Time</u>

Notice at this time to the potential class members is appropriate and essential. In FLSA class actions, the statute of limitations continues to run on the unnamed class members claims until they join the action by filing a consent with the court. The FLSA provides that in a collective action such as this, an action shall not commence as to opt-in Plaintiffs until such Plaintiffs file written consent with the court. *See* 29 U.S.C. §§216(b), 256.

In *Hoffman,* the Supreme Court authorized district courts to facilitate notice to putative class members. 493 U.S. at 171-72. Since this decision, trial and appellate courts, including this Court, have uniformly authorized the type of notice sought in this case. *See Hunter,* 346 F. Supp. 2d at 121; *Robinson-Smith*, 2001 U.S. Dist. LEXIS 25516, at * 8-9; *McNeil*, 1999 U.S. Dist. LEXIS 23388, at * 4-7.[3] Furthermore, as recognized and relied upon by this Court, the Supreme Court has also authorized district courts to order a defendant to produce names and addresses of putative class members in a collective action. *See Hoffman,* 493 U.S. at 170; *Hunter*, 346 F. Supp. 2d at 121; *Robinson-Smith*, 2001 U.S. Dist. LEXIS 25516, at * 3, 9; *McNeil*, 1999 U.S. Dist. LEXIS 23388, at * 5-10. Plaintiffs request both notice and such information dating back three years from the filing of the Complaint.

Courts "have endorsed expedited notice as a means of facilitating the FLSA's broad remedial purpose of promoting efficient case management." *Hoffman*, 982 F. Supp. at 262. The

---

[3]        *See, e.g., Shaffer v. Farm Fresh, Inc.*, 966 F.2d 142, 147 (4th Cir. 1992), *cert. denied*, 113 S.Ct. 657 (1993); *Dybach v. State of Florida Dep't of Corrections*, 942 F.2d 1562, 1567 (11th Cir. 1991); *Severtson v. Phillips Beverage Co.*, 141 F.R.D. 276, 280 (D.Minn. 1992); *Garner v. G.D. Searle Pharmaceuticals & Co.*, 802 F. Supp. 418, 424 (M.D.Ala. 1991); *Church,* 137 F.R.D. at 310.

need for early notice is particularly compelling in cases, like this one, where it is "evident that a group of 'similarly situated' potential plaintiffs exist." *See id.* at 264. And, in light of the evidence Plaintiffs have already obtained to show a pattern of conduct and similarity among class members, there is no need to allow time for preliminary discovery before the class is conditionally certified and notice is issued.

Because of the nature of InterSolutions' misconduct, timely notification to FLSA class members is essential here. InterSolutions' years of misrepresentations to new hires during orientation and to many hourly employees who raised questions about their unpaid overtime have likely lulled many putative class members into believing that they were not entitled to overtime and/or were unable to obtain relief. In addition, InterSolutions' letters and checks may have misinformed putative class members about the amount of overtime they are entitled to and/or may have misled them into believing that any unpaid overtime and liquidated damages have been properly remedied, thereby discouraging people from coming forward on their own. Plaintiffs in this case have a very strong argument that the violations alleged in this case were willful and intentional and, therefore, that Plaintiffs may recover overtime compensation dating back three years from the date they file written consent. *See* 29 U.S.C § 255.

### III.    Conclusion

WHEREFORE, Plaintiffs respectfully request that this Court conditionally certify a collective action of "all persons who are or have been employed by InterSolutions as temporary employees and who worked more than forty (40) hours during any given work week between November 29, 2003 and the present";[4] approve Plaintiffs' proposed Notice, *see* Ex. A; and order

---

[4]     The Amended Complaint defines the class more broadly, and includes all "hourly employees." *See* Amended Complaint at ¶¶ 15-16. Plaintiffs are now clarifying that the class is limited to "temporary employees," meaning only those hourly employees who were placed by

InterSolutions to produce to Plaintiffs the names and most current addresses of all current and former employees who fall within the definition of the above class, dating back three years from November 29, 2006.

Dated: February 16, 2007

Respectfully submitted,

_____//s//_____
Thomas J. Mikula (D.C. Bar No. 396105)
Adam M. Chud (D.C. Bar No. 468443)
Sarah S. Keast (D.C. Bar No. 493632)
Goodwin Procter LLP
901 New York Avenue, N.W.
Washington, D.C.  20001
Tel.: (202) 346-4000
Fax:  (202) 346-4999

Susan E. Huhta (D.C. Bar No. 453478)
Carolyn P. Weiss (D.C. Bar No. 480697)
Washington Lawyers' Committee for
    Civil Rights and Urban Affairs
11 Dupont Circle, N.W., Suite 400
Washington, D.C.  20036
Tel.: (202) 319-1000
Fax:  (202) 319-1010

*Counsel for Chanel Cryer, James Byrd,
Jonathan Cashwell, and Marc Inman*

---

InterSolutions in temporary positions in buildings around the Washington, D.C. metropolitan area.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHANEL CRYER, JAMES BYRD,<br>JONATHAN CASHWELL, and<br>MARC INMAN,<br>On behalf of themselves and all others<br>similarly situated,<br><br>                Plaintiffs,<br><br>v.<br><br>INTERSOLUTIONS, INC.,<br>DREW GOLIN, and<br>SARAH WALDER,<br><br>              Defendants. | )<br>)<br>)<br>)<br>)<br>)   Case No. 06-02032 (EGS)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**[PROPOSED] ORDER CERTIFYING CLASS AND**
**AUTHORIZING CLASS NOTICE AND LIMITED DISCOVERY**

This matter having come before the Court upon the Motion of Plaintiffs, Chanel

Cryer, James Byrd, Jonathan Cashwell, and Marc Innman, individually and on behalf of a

class of persons, for conditional class certification, issuance of notice, and an order for

certain discovery, IT IS HEREBY ORDERED AS FOLLOWS:

1.     The Court certifies a collective action class under 29 U.S.C. § 216(b)

defined as "all persons who are or have been employed by InterSolutions as temporary

employees and who worked more than forty (40) hours during any given work week

between November 29, 2003 and the present."

2.     The Court approves the proposed Class Notice submitted with Plaintiffs'

Motion.

3.      The Court orders Defendants to produce to Plaintiffs the names and last known addresses of all current and former temporary employees, dating back three years from November 29, 2006.


Dated: _____          _____
                                     Judge Emmet G. Sullivan

# Exhibit A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CHANEL CRYER, | ) | |
| JAMES BYRD, | ) | |
| JONATHAN CASHWELL, and | ) | |
| MARC INMAN, | ) | |
|     Individually and on behalf of all | ) | |
|     others similarly situated, | ) | |
| | ) | |
|       Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 06-02032 (EGS) |
| | ) | |
| INTERSOLUTIONS, INC., | ) | |
| DREW GOLIN, and | ) | |
| SARAH WALDER, | ) | |
| | ) | |
|       Defendants. | ) | |
| _____ | ) | |

**NOTICE OF LAWSUIT
AGAINST INTERSOLUTIONS, INC., DREW GOLIN, AND SARAH WALDER
SEEKING OVERTIME PAY FOR TEMPORARY EMPLOYEES**

*A Court has authorized this Notice.  This is not an advertisement.  Please review this Notice carefully, as it details certain legal rights that you may have.*

    This Notice is to inform you of your right to join a lawsuit filed against InterSolutions, Inc., Drew Golin, and Sarah Walder.  The lawsuit seeks to recover unpaid overtime that may be owed to current and former temporary employees of InterSolutions.  If you wish to join this suit, you must complete and return the attached Notice of Consent to the address indicated below by _____.

    *You may participate in this lawsuit even if you have recently received checks from InterSolutions purporting to pay you for unpaid overtime.  Those checks may not have provided all of the unpaid overtime payments to which you may be entitled.*

**What This Lawsuit Is About**

    The Complaint in this lawsuit alleges that InterSolutions failed to pay its temporary employees overtime.  It claims that InterSolutions did not pay the full time-and-a-half the regular rate of pay for all hours worked over 40 in one week, and that this conduct violates federal law.  The Complaint also claims that InterSolutions' conduct was willful and intentional, and seeks to recover for the temporary employees all money to which they are entitled.

As a current or former InterSolutions temporary employee, you have been identified as an individual who may be entitled to seek overtime pay in this lawsuit. The proposed class in this action is defined as: "all persons who are or have been employed by InterSolutions as temporary employees and who worked more than forty (40) hours during any given work week between November 29, 2003 and the present."

**Protection Against Retaliation**

Federal law forbids InterSolutions from retaliating or discriminating against you in any way if you decide to join this lawsuit.

**How To Join This Lawsuit**

Enclosed with this Notice are a Notice of Consent and an envelope addressed to the attorneys who represent the Plaintiffs. **If you decide to join in this lawsuit, you must complete and sign the Notice of Consent form, postmarked on or before _____, 2007 and mail it to:**

    Sarah Keast, Esq.
    Goodwin Procter LLP
    901 New York Avenue, N.W.
    Washington, D.C. 20001

**If your Notice of Consent is postmarked after _____, 2007, you will not be allowed to join in this lawsuit.**

**The Legal Effect of Joining or Not Joining This Lawsuit**

If you decide to join this lawsuit, you will be bound by any judgment entered by the Court. While this lawsuit is proceeding, you may have to answer written questions under oath, or to give sworn testimony. **Under no circumstances will you be personally responsible for paying any attorneys' fees or costs.**

If you do not join in this lawsuit, you will not be entitled to any money that the Court may award if the plaintiffs prevail.

**Further Information Is Available**

If you have any questions, please contact one of the plaintiffs' attorneys identified below, who will represent you if you decide to join the lawsuit. Do **not** contact the Court.

    Carolyn Weiss                          Sarah Keast
    Washington Lawyers' Committee          Goodwin Procter LLP
    For Civil Rights and Urban Affairs     901 New York Avenue, N.W.
    11 Dupont Circle, NW, Ste. 400         Washington, D.C. 20001
    Washington, D.C. 20036                 (202) 346-4000
    (202) 319-1000

**<u>The Court Has Not Yet Made Any Decisions About the Merits of Plaintiffs' Claims</u>**

  This Notice is issued to inform potential class members of their right to participate in this case.  Although the Court has approved this Notice, it has not yet made any decision as to the merits of the claims and defenses of each party.


_____
Judge Emmet G. Sullivan
United States District Judge

LIBW/1620927.2

# Exhibit B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHANEL CRYER )<br>JAMES BYRD )<br>JONATHAN CASHWELL )<br>MARC INMAN, )<br>On behalf of themselves and all others )<br>similarly situated, )<br> )<br>Plaintiff, )<br> )<br>v. )<br> )<br>INTERSOLUTIONS, INC., )<br>DREW GOLIN, and )<br>SARAH WALDER, )<br> )<br>Defendants. )<br>_____ )<br> )| Civil Action No.:  06-2032 (EGS) |

### <u>Declaration of Linda Green</u>

I, Linda Green, declare as follows:

1.      My name is Linda Green.  I am over the age of 18 and am legally competent to make this Declaration.  This statement is based on my own personal knowledge.

2.      I have carefully read over this Declaration before signing it, and it represents my statement.  I understand that in signing this Declaration, I am swearing to tell the truth under penalty of perjury, and that it may be used in the lawsuit against Intersolutions.  I also understand that I may be called as a witness in this matter and, if so, I would be able to testify competently about the facts that are in this Declaration.

3.      Starting in 2003, I began working for InterSolutions as a part-time, temporary employee in InterSolutions' Concierge Division, which placed temporary employees at client sites in front desk concierge positions.

Initialed:

4.      In early 2004, I began working for InterSolutions full-time as an in-house temporary employee doing basic clerical work for the billing department. I was not, however, involved in payroll practices, such as determining rates of pay, overtime pay, and other payroll matters. During this period, I worked more than forty hours per week on several occasions, but was not paid time and a half my regularly hourly wage for the hours I worked in excess of forty.

5.      In the Spring of 2004, InterSolutions' co-owners, Drew Golin and Sarah Walder, hired me as the full-time permanent Manager of the Concierge Division. I served as the Concierge Division Manager until I was terminated from my position in August 2006.

6.      As Manager of the Concierge Division, I reported directly to InterSolutions' co-owners, Drew Golin and Sarah Walder.

7.      As a manager, I had authority for hiring, training and placing Concierge Division temporary employees, and I performed these responsibilities in a manner consistent with the training and instructions that the owners had given me.

8.      Even though I was Manager of the Concierge Division, InterSolutions' co-owners always had decision-making authority over InterSolutions' payroll policies and practices, including but not limited to the employees' rate of pay, payment of overtime hours, method of payment and maintenance of employee records.

9.      InterSolutions' co-owners also maintained operational control over all aspects of InterSolutions' day-to-day functions beyond payroll practices and activities.

10.     Soon after I became Manager of the Concierge Division and on several additional occasions during my employment with InterSolutions, Mr. Golin informed me that Intersolutions would not pay its Concierge Division temporary employees overtime pay for hours worked in excess of forty in a given week. I was surprised and troubled by Mr. Golin's statement.

Initialed:

- 2 -

11.    At some point, Mr. Golin instructed me that the one exception to InterSolutions' refusal to pay overtime was when the employees worked the overtime hours for the same client at which they worked the first forty hours because, in those situations, InterSolutions could bill the client for an overtime rate.

12.    Beginning soon after I became Manager of the Concierge Division, several individual temporary employees complained about InterSolutions' denial of overtime pay and I informed Mr. Golin about these complaints.  I estimate that I received complaints from one to two dozen different employees, and several complained multiple times.  I also know that some employees complained directly to payroll, but I do not know how many individuals did that.

13.    In response to each employee's complaint about overtime pay owed, Mr. Golin instructed me to tell the employee that he or she was not entitled to overtime pay and/or was only entitled to overtime pay if the employee worked more than forty hours per week for the same client.  If the employee persisted in his or her complaints, sometimes the owners would decide to pay the complaining employee an additional amount of money less than one and a half times the regular rate of pay in order to try to appease the employee.

14.    On many occasions during my employment with InterSolutions as Manager of the Concierge Division, I challenged Mr. Golin about his refusal to pay the overtime due InterSolutions' temporary employees.  Sometimes I confronted him as a result of temporary employees' complaints about the company's refusal to pay overtime, and sometimes I confronted him as a result of my own ongoing concerns about the company's practice of refusing to pay overtime.

15.    On all of the occasions when I confronted Mr. Golin about complaints by temporary employees who had been denied overtime pay due them by InterSolutions, Mr. Golin became

Initialed: _____

angry. He became particularly angry when I raised complaints by employees who had

complained previously.  During these conversations, Mr. Golin would instruct me not to give the

complaining employee additional work.

16.    As a result of Mr. Golin's temper around issues of overtime pay, I was concerned that I

would jeopardize my job if I disregarded his instructions.  However, despite his instructions to

the contrary, I did continue to give work to some of the employees who complained about not

receiving their overtime pay.  This further angered Mr. Golin.

17.    In early 2006, the owners of InterSolutions hired John Wagithuka to be the Chief

Executive Officer of the company and to take over some of the management of the day-to-day

business operations of the company.  I spoke with Mr. Wagithuka on more than one occasion

about the fact that the owners of the company were denying temporary employees overtime pay

that was owed to them.  I impressed upon Mr. Wagithuka my concern about the company's

overtime practices and he acknowledged that there was problem with these practices.  I had this

conversation with Mr. Wagithuka in the hope that he would convince the owners to comply with

the overtime laws.

18.    On or about March 2006, Mr. Wagithuka announced at a staff meeting that the company

would start paying correct overtime to the temporary employees who worked for the Leasing

Division but that the temporary employees of the Concierge Division would still not receive

proper overtime pay.

19.    In June 2006, after it became apparent that the new CEO was either unwilling or unable

to influence the owners to comply with overtime laws, I filed a complaint regarding the

company's overtime violations with the United States Department of Labor.

20.    In August 2006, I was terminated from InterSolutions.

Initialed: _____

21.    At the time of my termination, InterSolutions was still denying overtime pay that was owed to the temporary employees of the Concierge Division.

22.    During the course of my employment at Intersolutions, there were approximately 400-500 temporary employees who worked in the Concierge Division.

23.    I estimate that a significant percent of the temporary employees who worked for InterSolutions' Concierge Division during my tenure with the company were denied overtime pay that was owed to them.

24.    I estimate that a significant percent of InterSolutions' concierge temporary positions and assignments were located in the State of Maryland.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February _15_, 2007.

_Linda Green_
Linda Green

Initialed: _____

# Exhibit C

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CHANEL CRYER,           )
On behalf of herself and all others   )
similarly situated,          )
                )
      Plaintiff,        )
                )
v.                )    Civil Action No.:  06-2032 (EGS)
                )
INTERSOLUTIONS, INC.,     )
DREW GOLIN, and       )
SARAH WALDER,        )
                )
      Defendants.     )
_____)

## Declaration of Marc Inman

I, Marc Inman, declare as follows:

1.    My name is Marc Inman.  I am over the age of 18 and am legally competent to make this Declaration.  This statement is based on my own personal knowledge.

2.    I have carefully read over this Declaration before signing it, and it represents my statement.  I understand that in signing this Declaration, I am agreeing to tell the truth under penalty of perjury, and that the Declaration may be used in the lawsuit against Intersolutions.  I also understand that I may be called as a witness in this matter and, if so, I would be able to testify competently about the facts that are in this Declaration.

Initialed: _____

3.     I worked as a temporary employee for Intersolutions, Inc., from approximately the Spring of 2004 until approximately the Spring of 2006.

4.     While I was an employee of Intersolutions, my work assignments involved staffing the front desk as a concierge in buildings in the Washington metropolitan area.  These buildings were mostly in Washington, D.C., but also in Virginia.

5.     While I was an employee of Intersolutions, I often worked more than 40 hours in a work week.  During some of the weeks that I worked more than 40 hours, Intersolutions gave me work assignments that required me to work at different job locations for different clients of Intersolutions during that week.

6.     Intersolutions did not pay me one-and-a-half times my regular hourly rate of pay for all hours that I worked over 40 hours during a given work week.

7.     Some time around the end of 2005, I called Intersolutions to talk about the fact that the company was not paying me overtime.  I was told that the company would only pay me at a rate of one-and-a-half times my regular hourly rate if I worked more than 40 hours in a given week at a single job site.  I was told that this was Intersolutions' overtime pay policy because Intersolutions could not bill its clients for overtime work unless an Intersolutions employee worked at that client site for over 40 hours in one week.

8.     At some point after that, I got a call from Drew Golin, one of Intersolutions' owners, about my complaints about lack of overtime pay.  He told me that if I was

Initialed: _____

- 2 -

not satisfied with the way in which Intersolutions was paying me, then I should not work more than 40 hours in a week.  He also told me that the company was hiring many new employees to fill concierge positions, and that the company might not need my services any longer.  I heard this as a threat that I would stop getting work assignments if I continued to complain about the company's overtime practices.

9.    I stopped working for Intersolutions because the company stopped giving me work.  At some point during the last six months, I spoke with someone at Intersolutions, who told me that I had been put on "inactive" status, even though I never told anyone at Intersolutions that I couldn't or wouldn't accept assignments.

10.    To this day, Intersolutions has not paid me the overtime pay that it owes me.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on December  29 , 2006.

_____
Marc Inman

Initialed: _____

- 3 -

# Exhibit D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHANEL CRYER,<br>On behalf of herself and all others<br>similarly situated,<br><br>        Plaintiff,<br><br>v.<br><br>INTERSOLUTIONS, INC.,<br>DREW GOLIN, and<br>SARAH WALDER,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No.: 06-2032 (EGS) |

### Declaration of Ellaretha Jones

I, Ellaretha Jones, declare as follows:

1.    My name is Ellaretha Jones. I am over the age of 18 and am legally competent to make this Declaration. The facts set forth below are based upon my own personal knowledge.

2.    I have thoroughly reviewed this Declaration, and it represents my statement. I understand that I am giving this Declaration under penalty of perjury, and that it may be used in litigation.

3.    I worked as a temporary employee for Intersolutions, Inc., from approximately November 2004 until approximately May of 2005.

4.     While I was an employee of Intersolutions, I worked as a concierge at the front desk in buildings in Washington, D.C., Maryland and Virginia.

5.     While I was an employee of Intersolutions, I worked more than 40 hours per week on at least two occasions.

6.     During the weeks I worked overtime, Intersolutions did not pay me one-and-a-half times my regular hourly rate of pay for all the hours that I worked over 40 hours during a given work week.

7.     At some point, I contacted Intersolutions to ask why I was not being paid overtime, and I was told that I was not entitled to overtime unless I worked more than 40 hours at a single client site.

8.     To this day, Intersolutions has not paid me the overtime pay that I am due.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 2 1, 2006.

Ellaretha Jones

# Exhibit E

**Earnings Statement**



INTERSOLUTIONS INC
1007 E STREET SE
WASHINGTON, DC 20003

Period Ending:     07/24/2004
Pay Date:          07/30/2004

00000000017
**CHANEL CRYER**
**2251 SHERMAN AVE**
**WASHINGTON, DC 20001**

Taxable Marital Status:   Single
Exemptions/Allowances:
    Federal:       0
    DC:            0

Social Security Number: 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

| Earnings | rate | hours | this period | year to date |
|----------|------|-------|-------------|--------------|
| Regular  | 10.0000 | 111.00 | 1,110.00 | 1,905.00 |
| Gross Pay |  |  | $1,110.00 | 1,905.00 |

| Deductions | Statutory | | |
|------------|-----------|--|--|
| | Federal Income Tax | -137.66 | 201.75 |
| | Social Security Tax | -68.82 | 118.11 |
| | Medicare Tax | -16.09 | 27.62 |
| | DC State Income Tax | -69.78 | 104.03 |
| | **Other** | | |
| | Checking | -817.65 | |
| | Net Pay | $0.00 | |

Your federal taxable wages this period are
$1,110.00

COPY        COPY        COPY

© 2000 ADP, Inc.

VERIFY DOCUMENT AUTHENTICITY - COLORED AREA MUST CHANGE IN TONE GRADUALLY AND EVENLY FROM DARK AT TOP TO LIGHTER AT BOTTOM

INTERSOLUTIONS INC
1007 E STREET SE
WASHINGTON, DC 20003

Advice number:   00000310017
Pay date:        07/30/2004

Deposited to the account of
CHANEL CRYER

| account number | transit ABA | amount |
|----------------|-------------|--------|
| 000012371628 | 3222 7728 | $817.65 |

**THIS IS NOT A CHECK**

**NON-NEGOTIABLE**

THE ORIGINAL DOCUMENT HAS AN ARTIFICIAL WATERMARK ON THE BACK - HOLD AT AN ANGLE TO VIEW WHEN CHECKING THE ENDORSEMENT

RQA   500000          0000140018   1

**Earnings Statement**

ADP®

*INTERSOLUTIONS INC*
*1007 E STREET SE*
*WASHINGTON, DC  20003*

| | |
|---|---|
| Period  Ending: | 04/03/2005 |
| Pay  Date: | 04/08/2005 |

00000000018
**CHANEL CRYER**
**108 WEST MILL AVE.**
**CAPITOL HEIGHTS,  MD  20743**

Taxable Marital Status:   Single
Exemptions/Allowances:
Federal:          0
MD:               0 MD Non-Resident

Social Security Number:  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

| Earnings | rate | hours | this period | year to date |
|---|---|---|---|---|
| Regular | 107.75 | 1,077.50 | | 2,846.50 |
| Holiday | 6.00 | 90.00 | | 90.00 |
| Gross Pay | | | $1,167.50 | 1,946.50 |

| Deductions | Statutory | | |
|---|---|---|---|
| | Federal Income Tax | -146.09 | 214.71 |
| | Social Security Tax | -72.38 | 120.68 |
| | Medicare Tax | -16.93 | 28.22 |
| | MD State Income Tax | -65.43 | 104.09 |
| | **Other** | | |
| | Checking | -866.67 | |
| | Net Pay | $0.00 | |

Your federal  taxable  wages  this  period  are
$1,167.50

©2001 Automatic Data Procession  Inc.

VERIFY DOCUMENT AUTHENTICITY - COLORED AREA MUST CHANGE IN TONE GRADUALLY AND EVENLY FROM DARK AT TOP TO LIGHTER AT BOTTOM

INTERSOLUTIONS INC.
1007 E STREET SE
WASHINGTON, DC  20003

| | |
|---|---|
| Advice  number: | 000000140018 |
| Pay  date: | 04/08/2005 |

Deposited to the account of
CHANEL CRYER

| account number | transit ABA | amount |
|---|---|---|
| 000012371628 | 3222  7728 | $866.67 |

THIS IS NOT A CHECK

NON-NEGOTIABLE

RQA   500000        0000220019   1



## Earnings Statement

INTERSOLUTIONS INC
1007 E STREET SE
WASHINGTON, DC 20003

Period Ending:     05/29/2005
Pay Date:          06/03/2005

00000000019
**CHANEL CRYER**
**108 WEST MILL AVE.**
**CAPITOL HEIGHTS, MD 20743**

Taxable Marital Status:   Single
Exemptions/Allowances:
  Federal:     0
  MD:          0 MD Non-Resident

Social Security Number: XXX-XX-5021

| Earnings | rate | hours | this period | year to date |
|----------|------|-------|-------------|--------------|
| Regular  |      | 80.00 | 800.00      | 4,956.50     |
| Overtime |      | 40.25 | 522.37      | 522.37       |
| Holiday  |      |       |             | 90.00        |
| Gross Pay |     |       | $1,322.37   | 4,578.87     |

| Deductions | Statutory |  |  |
|------------|-----------|--|--|
| | Federal Income Tax | -180.41 | 504.51 |
| | Social Security Tax | -81.99 | 283.89 |
| | Medicare Tax | -19.18 | 66.39 |
| | MD State Income Tax | -74.73 | 245.63 |
| | **Other** | | |
| | Checking | -966.06 | |
| | Net Pay | $0.00 | |

Your federal taxable wages this period are
$1,322.37

© 2000 ADP, Inc

VERIFY DOCUMENT AUTHENTICITY • COLORED AREA MUST CHANGE IN TONE GRADUALLY AND EVENLY FROM DARK AT TOP TO LIGHTER AT BOTTOM

INTERSOLUTIONS INC
1007 E STREET SE
WASHINGTON, DC 20003

Advice number:     00000220019
Pay date:          06/03/2005

Deposited to the account of     | account number | transit ABA | amount
**CHANEL CRYER**                | 000012371628   | 3222 7728   | $966.06

THIS IS NOT A CHECK

**NON-NEGOTIABLE**

RQA: 500000   0000240018   0000240018

**Earnings Statement**

ADP®

INTERSOLUTIONS INC
1007 E STREET SE
WASHINGTON, DC 20003

Period Ending: 06/12/2005
Pay Date: 06/17/2005

Taxable Marital Status:   Single
Exemptions/Allowances:
   Federal:   0
   MD:   0 MD Non-Resident

0000000018
CHANEL CRYER
108 WEST MILL AVE.
CAPITOL HEIGHTS, MD 20743

Social Security Number:  XXX-XX-5021

| Earnings | rate | hours | this period | year to date |
|----------|------|-------|-------------|--------------|
| Regular | 74.75 | | 747.50 | 5,704.00 |
| Overtime | 24.00 | | 312.36 | 834.73 |
| Bonus | | | 80.00 | 80.00 |
| Holiday | 16.50 | | 247.50 | 337.50 |
| Gross Pay | | | $1,387.36 | 6,966.23 |

| Deductions | Statutory | | | |
|------------|-----------|--|--|--|
| | Federal Income Tax | -196.66 | | 701.17 |
| | Social Security Tax | -86.02 | | 369.91 |
| | Medicare Tax | -20.12 | | 86.51 |
| | MD State Income Tax | -78.63 | | 324.26 |
| | **Other** | | | |
| | Checking | -1,005.93 | | |
| | **Net Pay** | $0.00 | | |

Your federal taxable wages this period are
$1,387.36

© 2000 ADP, Inc

VERIFY DOCUMENT AUTHENTICITY - COLORED AREA MUST CHANGE IN TONE GRADUALLY AND EVENLY FROM DARK AT TOP TO LIGHTER AT BOTTOM

F48183243

INTERSOLUTIONS INC
1007 E STREET SE
WASHINGTON, DC 20003

Advice number:   00000240018
Pay date:   06/17/2005

| Deposited to the account of | account number | transit ABA | amount |
|------------------------------|----------------|-------------|--------|
| CHANEL CRYER | 000012371628 | 3222 7728 | $1,005.93 |

THIS IS NOT A CHECK

NON-NEGOTIABLE

# Earnings Statement

**ADP**®

| CO. | FILE | DEPT. | CLOCK | VCHR. NO. | |
|-----|------|-------|-------|-----------|---|
| RQA | 102731 | | | 0000300008 | 1 |

*INTERSOLUTIONS INC*
*1007 E STREET SE*
*WASHINGTON, DC 20003*

Period Ending:    07/24/2005
Pay Date:         07/29/2005

00000000008
**SHERRY BROWN**
**325 DECATUR ST.**
**NW #2**
**WASHINGTON DC 20011**

Taxable Marital Status:   Single
Exemptions/Allowances:
    Federal:    1
    DC:         1

Social Security Number: XXX-XX-6964

| Earnings | rate | hours | this period | year to date |
|----------|------|-------|-------------|--------------|
| Regular | | 80.00 | 800.00 | 8,922.50 |
| Overtime | | 16.00 | 176.48 | 491.48 |
| Bonus | | | | 240.00 |
| Holiday | | | | 240.00 |
| Gross Pay | | | $976.48 | 9,893.98 |

| Deductions | Statutory | | |
|------------|-----------|---|---|
| | Federal Income Tax | -98.97 | 822.98 |
| | Social Security Tax | -60.54 | 613.43 |
| | Medicare Tax | -14.16 | 143.46 |
| | DC State Income Tax | -55.82 | 498.18 |
| | **Other** | | |
| | Checking | -746.99 | |
| | Net Pay | $0.00 | |

Your federal taxable wages this period are $976.48

©2001 Automatic Data Processing, Inc.

TEAR HERE

© 2000 ADP, Inc.

VERIFY DOCUMENT AUTHENTICITY - COLORED AREA MUST CHANGE IN TONE GRADUALLY AND EVENLY FROM DARK AT TOP TO LIGHTER AT BOTTOM

INTERSOLUTIONS INC
1007 E STREET SE
WASHINGTON, DC 20003

Advice number:     00000300008
Pay date:          07/29/2005

**THIS IS NOT A CHECK**

| Deposited to the account of | account number | transit ABA | amount |
|-----------------------------|----------------|-------------|--------|
| **SHERRY BROWN** | 0202827470 | 2520 7301 | $746.99 |

# NON-NEGOTIABLE

RQA   102731                      0000320008   1

**Earnings Statement**

**ADP**®

INTERSOLUTIONS INC
1007 E STREET SE
WASHINGTON, DC 20003

Period Ending:        08/07/2005
Pay Date:             08/12/2005

00000000008
**SHERRY BROWN**
**325 DECATUR ST.**
**NW #2**
**WASHINGTON DC 20011**

Taxable Marital Status:   Single
Exemptions/Allowances:
    Federal:    1
    DC:         1

Social Security Number:  XXX-XX-6964

| Earnings | rate | hours | this period | year to date |
|----------|------|-------|-------------|--------------|
| Regular | | 80.00 | 800.00 | 9,722.50 |
| Overtime | | 17.00 | 191.48 | 682.96 |
| Bonus | | | | 240.00 |
| Holiday | | | | 240.00 |
| **Gross Pay** | | | **$991.48** | 10,885.46 |

| Deductions | Statutory | | | |
|------------|-----------|--|--|--|
| | Federal Income Tax | -101.22 | | 924.20 |
| | Social Security Tax | -61.47 | | 674.90 |
| | Medicare Tax | -14.38 | | 157.84 |
| | DC State Income Tax | -56.94 | | 555.12 |
| | **Other** | | | |
| | Checking | -757.47 | | |
| | **Net Pay** | | | **$0.00** |

Your  federal  taxable  wages  this  period  are  $991.48

©2001 Automatic Data Processing, Inc.

© 2000 ADP, Inc.

▼ TEAR HERE

VERIFY DOCUMENT AUTHENTICITY - COLORED AREA MUST CHANGE IN TONE GRADUALLY AND EVENLY FROM DARK AT TOP TO LIGHTER AT BOTTOM.

INTERSOLUTIONS INC
1007 E STREET SE
WASHINGTON, DC  20003

Advice number:        00000320008
Pay date:             08/12/2005

**THIS IS NOT A CHECK**

| Deposited to the account of | account number | transit ABA | amount |
|------------------------------|----------------|-------------|--------|
| SHERRY BROWN | 0202827470 | 2520 7301 | $757.47 |

**NON-NEGOTIABLE**

CO.    FILE    DEPT.    CLOCK  NUMBER    049
RQA   101161                   0080063793    1

# Earnings Statement

**ADP**

*INTERSOLUTIONS, INC*
*1418 PENSYLVANIA AVE SE*
*WASHINGTON, DC 20003*

Period Ending:    10/16/2005
Pay Date:         10/21/2005

Taxable Marital Status:   Single
Exemptions/Allowances:
   Federal:        2
   VA:             0

**JAMES BYRD**
**5042 S. 9TH ST.**
**ARLINGTON, VA 22204**

Social Security Number: XXX-XX-2668

| Earnings | rate | hours | this period | year to date |
|----------|------|-------|-------------|--------------|
| Regular  |      | 80.00 | 800.00      | 1,250.00     |
| Overtime |      | 17.00 | 189.49      | 189.49       |
| Gross Pay |     |       | $989.49     | 1,439.49     |

| Deductions | Statutory | | this period | year to date |
|------------|-----------|-|-------------|--------------|
| | Federal Income Tax   | -82.46 | 92.65 |
| | Social Security Tax  | -61.35 | 89.25 |
| | Medicare Tax         | -14.34 | 20.87 |
| | VA State Income Tax  | -40.37 | 52.11 |
| | Net Pay              | $790.97 | |

Your federal taxable wages this period are $989.49

©2001 Automatic Data Processing, Inc.

TEAR HERE

CO.   FILE   DEPT.   CLOCK   NUMBER   049
RQA   101161                 0080071243  1

# Earnings Statement

*INTERSOLUTIONS, INC*
*1418 PENSYLVANIA AVE SE*
*WASHINGTON, DC 20003*

Period Ending:     11/27/2005
Pay Date:          12/02/2005

Taxable Marital Status:  Single
Exemptions/Allowances:
   Federal:     2
   VA:          0

**JAMES BYRD**
**5042 S. 9TH ST.**
**ARLINGTON, VA 22204**

Social Security Number: XXX-XX-2668

| Earnings | rate | hours | this period | year to date |
|----------|------|-------|-------------|--------------|
| Regular  |      | 64.00 | 640.00      | 3,660.00     |
| Overtime |      | 16.00 | 176.48      | 613.48       |
| Holiday  |      | 16.00 | 240.00      | 240.00       |
| Gross Pay |     |       | $1,056.48   | 4,513.48     |

| Deductions | Statutory | | |
|------------|-----------|---|---|
| | Federal Income Tax | -92.51 | 358.11 |
| | Social Security Tax | -65.51 | 279.84 |
| | Medicare Tax | -15.32 | 65.45 |
| | VA State Income Tax | -44.22 | 180.71 |
| | Net Pay | $838.92 | |

Your federal taxable wages this period are
$1,056.48

©2001 Automatic Data Processing, Inc.

© 2000 ADP, Inc.

◀ TEAR HERE

CO.    FILE    DEPT.    CLOCK    NUMBER    049
**RQA**    101161                            0080081779    1

## Earnings Statement



INTERSOLUTIONS, INC
1418 PENSYLVANIA AVE SE
WASHINGTON, DC 20003

Period Ending:        01/22/2006
Pay Date:             01/27/2006

Taxable Marital Status:   Single
Exemptions/Allowances:
Federal:        2
MD:             2 MD Non-Resident
VA:             0

**JAMES BYRD**
**5042 S. 9TH ST.**
**ARLINGTON, VA 22204**

Social Security Number:  XXX-XX-2668

| Earnings | rate | hours | this period | year to date |
|----------|------|-------|-------------|--------------|
| Regular  |      | 80.00 | 800.00      | 1,415.00     |
| Overtime |      | 17.50 | 193.02      | 318.76       |
| Bonus    |      |       |             | 80.00        |
| Holiday  |      |       |             | 397.50       |
| Gross Pay |     |       | $993.02     | 2,211.26     |



| Deductions | Statutory |  |  |
|------------|-----------|--|--|
|            | Federal Income Tax   | -81.45 | 196.68 |
|            | Social Security Tax  | -61.57 | 137.10 |
|            | Medicare Tax         | -14.40 | 32.06  |
|            | VA State Income Tax  | -29.47 | 82.99  |
|            | Net Pay              | $806.13 |       |

Your federal taxable wages this period are $993.02





©2001 Automatic Data Processing, Inc.

©2000 ADP, Inc.

▼ TEAR HERE

CO.   FILE    DEPT.   CLOCK  NUMBER   049
RQA   101161                 0080086649  1

# Earnings Statement

INTERSOLUTIONS, INC
1418 PENSYLVANIA AVE SE
WASHINGTON, DC 20003

Period Ending:    02/19/2006
Pay Date:         02/24/2006

Taxable Marital Status:   Single
Exemptions/Allowances:
    Federal:      2
    VA:           0

JAMES BYRD
5042 S. 9TH ST.
ARLINGTON, VA 22204

Social Security Number: XXX-XX-2668

| Earnings | rate | hours | this period | year to date |
|----------|------|-------|-------------|--------------|
| Regular  |      | 80.00 | 800.00      | 3,015.00     |
| Overtime |      | 19.75 | 221.81      | 730.84       |
| Bonus    |      |       |             | 80.00        |
| Holiday  |      |       |             | 397.50       |
| Gross Pay |     |       | $1,021.81   | 4,223.34     |

| Deductions | Statutory | | |
|------------|-----------|--|--|
|            | Federal Income Tax | -85.76 | 363.47 |
|            | Social Security Tax | -63.36 | 261.85 |
|            | Medicare Tax | -14.82 | 61.24 |
|            | VA State Income Tax | -42.22 | 154.68 |
|            | Net Pay | $815.65 | |

Your federal taxable wages this period are
$1,021.81

©2001 Automatic Data Processing, Inc.

# Exhibit F

# POLICIES

# AND

# EXPECTATIONS

1

# WEEKLY TIMESHEETS AND PAYCHECKS

*To ensure accurate and prompt paychecks, please adhere to the following procedures: at the end of each work week (or each assignment if an assignment is less than one week in duration), please have your time sheet signed by your on-the-job supervisor and fax it to the InterSolutions office at (202) 546-7737, by Monday at 12 pm. The InterSolutions work week runs from Monday through Sunday. Paychecks are issued biweekly on Fridays.*

# PAY RATES

*Each InterSolutions assignment pays a specific hourly pay rate, which is explained to you at the beginning of each assignment. Pay rates vary from assignment to assignment. Some assignments may offer bonuses. If your employment with InterSolutions is terminated or should you resign for any reason, you will not be eligible for payment on any outstanding bonuses.*

# TERMINATION

*Once you have been hired at InterSolutions you will become an integral part of our team. As a representative of InterSolutions we ask you to always act and perform in a professional manner; respecting yourself as while as others around you, and show good judgment while working at InterSolutions' client sites. Always remember that the InterSolutions internal staff is here to help you lay your career path. Therefore, you should respect them all as your supervisors and professionals. Your employment relationship can and will be terminated for the any following:*

> *Two InterSolutions clients asking for you to not return to their work site.*
> *No call/No show (not showing up for assignment without notifying InterSolutions).*
> *Displaying unprofessional behavior towards employees, clients, and InterSolutions' internal staff.*

# TERMINATION OF ASSIGNMENT NOTICE

*Once you have accepted an assignment, we expect you to keep us informed of all important information regarding your assignment. As a representative of InterSolutions, we request that you contact us three working days before you terminate any assignment. If you fail to notify InterSolutions at least three working days before you terminate an assignment or if you "walk-away" from any InterSolutions assignment, your pay rate for your workweek will automatically be reduced to the legal minimum wage. The same penalty will apply if you fail to notify InterSolutions that your assignment is complete or has been terminated by the client company.*

*Always call the InterSolutions office if there is a question or problem regarding an assignment. Remember you are an InterSolutions Employee who should always report to the InterSolutions Staff.*

2

# NOTIFICATION

*Please call InterSolutions whenever any of the following situations occur:*

> *Your assignment is completed (your failure to do this within 72 hours will result in your being dropped from InterSolutions payroll as a "voluntary quit").*
> *Your assignment is extended longer or ends earlier than scheduled.*
> *You will be late or absent from your scheduled assignment, or you leave the job early.*
> *Whenever you will be unavailable for an assignment (please tell us when you expect to be available again.)*
> *You wish to be replaced on an assignment or to be reassigned to another.*
> *Our client expresses an interest in hiring you for a permanent position (we will make all necessary arrangements with the client).*

# HOLIDAY PAY

*InterSolutions consultants who have been paid for working a total of 500 hours over any period of time and work through the week of the holiday (at least 4 days) are eligible for paid holidays. Holiday pay is for 8 hours and is equal to the average hourly pay rate you received for the days you worked during the holiday week. The holidays for which you are eligible to be paid are:*

*New Years Day, Easter, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day*

# GENERAL POLICIES

*No employee is allowed at any time to authorize vehicles for towing from the community without the direct authorization of the Property Manager. Notification of parking violations may be issued, however, they are to be warnings only.*

*Packages at the front desk MUST be logged in on any shift they are received. Residents arriving for pick up must sign for; show I.D. and the slip from the deliverer. DO NOT ISSUE packages without proper Identity verification. Anyone doing so will be held personally responsible for the package. Place your initials next to the package that you are logging in.*

*All shifts are to brief the following shift of what is going on. We are should be very considerate of our colleagues and make sure not to leave them in the dark.*

*The front desk area should stay CLEAN at all times. You are on the front line and it is a poor picture to paint if the area is dirty and cluttered with unnecessary papers, books, etc.*

*Write down telephone messages in the message book. Message books will be placed at the front desk. All messages must be received in the appropriate manner. Messages on pieces of paper are not only unacceptable, but they are unprofessional.*

*Cigarette breaks cannot be taken without the authorization or proper coverage of the office or any employee on staff.*

3

# PAYCHECKS

*Your paychecks are processed based on the timesheets we receive. If you do not turn in your timesheet, you will not get paid. It is our goal to get your check to you as quickly and accurately as possible. Please follow these guidelines to ensure that you receive your paycheck on time.*

❖ *Fill out your timesheet COMPLETELY. Timesheets must have your name, client name, hours worked and proper signatures. We cannot process timesheets that do not have required signatures.*

❖ *One client per timesheet.*

❖ *One workweek per timesheet. Workweeks run Monday through Sunday.*

❖ *Holiday hours should not be written on timesheets.*

❖ *Timesheets that have not been received via mail or fax will not be processed.*

❖ *All timesheets must be received by Monday @ 12 pm.*

❖ *Payday is biweekly on Fridays.*

*We greatly appreciate your cooperation to ensure the accurate and efficient processing of your paychecks.*

### Please call us with any questions.

4

# BACKGROUND

5

# INTRODUCTION

### What is a concierge?

A concierge controls the front desk and offers superior customer service to everyone who enters the building

### What is the purpose of a concierge?

A concierge ensures that the expectations of current residents are exceeded; and that new customers are treated like current residents

### Which industries include concierge positions?

Hotel / Hospitality and Property Management

# PROPERTY MANAGEMENT INDUSTRY

### Categories of employees

- ➢ Concierge
- ➢ Office
- ➢ Maintenance

### Types of properties with concierge positions

- ➢ Luxury High-Rise Buildings
- ➢ Mid-Rise Buildings

# WHAT TO EXPECT WORKING AS A CONCIERGE

### Gate Keeping

Gate Keeping ensures that only residents and approved visitors are allowed to enter the building. Contractors and vendors must sign in and show a valid photo ID. In order for contractors or vendors to enter an occupied apartment, there MUST be a SIGNED letter from the resident giving that specific contractor or vendor permission to enter the apartment

### Leasing Inquiries

- ➢ Have the customer (i.e., "prospective resident") "make them-selves comfortable", NOT "have a seat"
- ➢ Offer refreshments
- ➢ Prepare a guest card
- ➢ Notify a leasing consultant

6

## *Resident Services*

> ➢ *Issuance of guest parking permits*
> ➢ *Package delivery*
> ➢ *Newspaper delivery*
> ➢ *Setting up breakfast bar*
> ➢ *Pet-sitting*

7

# POSITION

# DESCRIPTION

**Report to:**     Front Desk Manager

**Compensation:**     Non-Exempt / Hourly
Position is eligible for overtime.

# Qualifications:

Education     *No specific level of education is required. However, the position does require the ability to read and write English fluently, and the ability to effectively communicate with people both verbally and written.*

Experience     *Generally, no previous work or property management experience is required.*

Skills
- *Excellent verbal and written communication skills*
- *Ability to read and write English fluently*
- *Creative, craft-oriented abilities*
- *Strong listening skills and patience*
- *Strong customer service representation*
- *Strong organizational abilities*
- *Professional image*
- *Assertiveness*
- *Ability to function as a team player*
- *Very personable*

Licenses     *No specific license is required for this position.*

Training     Generally, no prior training is required. However, past experience in     customer relations is recommended.

9

# Essential Job
# Functions

## General

- Ensure the physical condition of the front desk area is neat and organized.
- Develop, refine and effectively implement excellent telephone and personal skills.
- Respond to the needs of residents.
- Maintain company customer service standards. Respond to resident requests and work with residents to minimize and resolve resident problems and complaints. Follow through to ensure issues are resolved.
- Clearly and effectively communicate with residents, other employees, vendors and supervisors in written and verbal form.

## Attendance

- You are required to report for work on time and to work all scheduled hours and any required overtime.
- It is a condition of employment that you arrange dependable transportation to the job.
- Excessive tardiness and/or absenteeism, even with acceptable explanations for absence/tardiness, are subject to disciplinary action up to and including immediate discharge at the sole discretion of the Company.
- The Company reserves the right to determine what constitutes excessive tardiness and/or absenteeism. In reviewing absenteeism and tardiness, the Company will not consider leaves of absence granted under the Family and Medical Leave policy or those granted as an accommodation for a disability.
- You must notify your front desk manager at least <u>one hour</u> prior to your scheduled start time if you will not be able to report to work as scheduled.
- You must contact and speak with your front desk manager (or other designated persons as assigned by your Manager). Leaving a message with the answering service or a co-worker when calling is not sufficient.
- If you are unable to call in yourself due to an emergency situation, you should have someone call in on your behalf. You should then personally follow up with your Manager as soon as practical.
- An associate who fails to report for two (2) consecutive scheduled days will be considered to have abandoned his/her job (voluntarily quit) and will not be eligible for rehire.
- You must report to your Manager after being late or absent, give an explanation of the circumstances surrounding your tardiness or absence and, when applicable, certify that you are able to return to work.
- Absences of three (3) or more days may require a doctor's note prior to returning to work.
- You must obtain your Manager's prior approval to leave Company premises during working hours.
- The position requires the ability to work any of the 7 days of the week, 52 weeks of the year.
- Due to the property staffing limitations, it is extremely critical that associates be able

11

> to work their scheduled hours on a consistent basis, and if necessary, overtime hours when requested.
> It is also important that individuals are flexible with scheduling to provide appropriate coverage.

## Time Records

> You are responsible for the accuracy of your own time records (punching in and out).
> You are not to punch in and out for another associate.
> Associates who punch in and out for other associates may be subject to discipline, up to and including immediate termination.
> Once your scheduled relief associate has punched in, you are required to punch out immediately. If you fail to punch out, your time sheet will reflect the time up to your relief's punch in time.

## Overtime

> It is expected that associates will work overtime when requested.
> Overtime is paid to non-exempt associates and must be authorized in advance by the Front Desk / Community Manager.
> Non-exempt associates are paid at time and one-half of their base hourly rates when they physically work over 40 hours in the workweek.
> If you work less than forty (40) hours Monday through Sunday, you are not entitled to overtime regardless of the number of hours worked in any one day, unless required by state or local law.
> Only hours actually worked are counted towards overtime, thereby excluding vacation, personal time off, bereavement, jury duty, Company-paid holidays, etc.
> For example, your weekly time record indicates 35 hours were actually worked and 8 were taken as holiday. Since actual hours worked did not exceed 40, all of the hours (43) would be paid at the straight-time hourly rate.
> If your weekly time record had shown that 44 hours were actually worked and 8 were taken as holiday, four hours would be paid at time and one-half, and the remaining 48 hours would be paid at the straight- time rate.

## Emergency and Safety Information

> Prepare and practice an emergency plan for the building in cases of emergency or evacuation.
> Understand what constitutes an emergency situation.
> Adhere to the Company's safety programs, policies and procedures.
> Maintain a safe environment for the on-site staff and residents.

*Safety Tips:*

    ➤    *Keep all keys in proper cabinets and drawers*
    ➤    *Never leave keys unattended*
    ➤    *Never give keys out without proper identification*
    ➤    *Never give out a resident's address, name, or phone number*

13

# SAMPLE FORMS
# FRONT DESK ASSOCIATES

## DELIVERY NOTICE

DATE _____

NAME _____    APT. _____

### WE ARE HOLDING FOR YOU:

_____ PACKAGE AT THE DESK

_____ FED EXP/EXP. MAIL

_____ SPECIAL DELIVERY

_____ OTHER

_____

CLERK _____

**Package Slip**



**Service Request**

14

| APT. NO. | RESIDENT NAME | SERVICE NEEDED | TIME | DATE | REC'D BY | PHONE NUMBER |
|---|---|---|---|---|---|---|
| | | | RECEIVED | | | |

### ARCHSTONE

### COMMUNITY MANAGEMENT SERVICE REQUEST

**528027**

**SPECIAL INSTRUCTIONS:**

**Dear Resident:**

☐ Your Service Request has been completed. Should you have any questions or need further assistance, please call or come by the leasing office. THANK YOU.

☐ Your Service Request has not been completed.

The reason for the delay is: _____

**SERVICE REQUESTED:**

We anticipate the work will be completed by: _____

We try to complete all Service Requests within 24 hours. We apologize for the delay. If you have any questions or need further assistance, please call or come by the leasing office.

Thank you for your patience in this matter.

**WORK PERFORMED:**

**PERFORMED BY** _____ **DATE** _____

**WORK PERFORMANCE FOLLOW UP:** _____

**FILE COPY**

Service Request (aka Work Order)

15

# PROFESSIONALISM

16

# DRESS CODE

*The InterSolutions, Inc. dress code is designed to promote a professional image of our on-site staff. The following guidelines have been established to ensure that the chosen accessories are consistent with the overall goal of the apparel program:*

### General Guidelines – All Associates

- *All clothing items should be neatly pressed.*
- *Hair is to be neat and well groomed. Unnatural hair colors are unacceptable (i.e. blue, purple, etc.).*
- *Decorative jewelry pins are not appropriate.*
- *Shoes must be well kept and in good condition.*
- *Oversized belt buckles are not appropriate.*
- *Fingernails should not exceed 1/4" in length from end of fingertips and should be well groomed.*

### General Guidelines – All Female Associates

- *Skirts/walk shorts may be no more that 3" above the knee.*
- *Blouses should be business in style and in white, cream, or ivory colors only. No plunging or revealing necklines.*
- *Coordinating scarves may be worn in a neat and conservative knot.*
- *Hosiery must be worn and coordinated with the outfit. However, it is limited to the following colors: nude, ivory, white, black, and navy. Fishnet hosiery or hosiery with seams or rhinestones is unacceptable.*
- *Simple pumps, loafers, or dress flat shoes with no more than a 2" heel are the standard.*
- *Acceptable colors include black, navy, taupe, or cream. Shoes must be well kept and in good condition.*
- *All jewelry and accessories must be conservative and limited to one or two strands of pearls or simple gold or silver necklace and earrings. Earrings are limited to two per ear as long as one per ear is a stud. Rings are limited to two per hand (wedding/ engagement ring sets are considered one ring). Large hoops or dangles are not appropriate.*
- *If nail polish is desired, it should be a neutral color or of the red base color, appropriate for a business office. Nail jewelry or nail art is unacceptable.*
- *Appropriate base garments should be worn. These include slips, camisoles, etc.*

### General Guidelines – All Male Associates

- *Dress shirts should be long-sleeved, cotton, button down, in white or blue only.*
- *Ties must be worn with coordinated colors to compliment the jacket or sport coat. Thin bolero or thin width ties are not acceptable. Ties with cartoon characters or other comic statements are not suitable.*
- *Loafers or lace-up shoes in black, brown, or burgundy are acceptable footwear. Cowboy boots, sneakers of any color, or steel toes are not acceptable.*
- *Socks must always be worn. Calf-length, conservative socks to coordinate with the color of the slacks or shoes are acceptable. White socks are not permissible.*

17

- *Men must be either clean-shaven or wear beards and/or mustaches that are neatly trimmed.*

# TELEPHONE TECHNIQUES

*The telephone is a very important tool in the Front Desk position. Phone callers will usually call for two main reasons: 1) to inquire about leasing or 2) to submit a service request. If they are inquiring about leasing while the office is open, ask them to please hold and you will transfer them to a leasing consultant. If the office is closed, then take a message and tell the caller that a leasing consultant will call them back when the office opens again.*

*As for service requests, make sure that you write down all of the pertinent information. Include the following: resident's name, address, phone number and the nature of the maintenance problem. Sometimes the caller will understandably be upset about their maintenance concern. It is important to remember to remain calm, cool and collect and to empathize with the caller's needs. If it is a maintenance emergency during office hours, contact and inform a member of management. For maintenance emergencies after office hours, contact the on-call maintenance technician.*

There are four parts to every phone call:

### Greeting
- *Answer the phone within 2 rings*
- *Smile (YOU CAN HEAR IT!!)*
- *Introduce the community and yourself*

### Information Gathering
- *Request the caller's name (and use it during the conversation)*
- *Ask how you can help them*
- *Answer every question that you can*

### Problem Solving (Dealing With Irate Customers)
- *LISTEN! Let them get it off their chests*
- *DO NOT let them verbally abuse you (e.g. cursing or berating)*
- *Let someone in the management office know what is going on*

### Closing
- *Obtain the caller's phone number if an associate needs to return the call.*
- *Offer directions to the property, if the caller wants to visit.*
- *Thank the prospect for calling.*

18

# FAIR HOUSING POLICIES

# INTERSOLUTIONS, INC. FAIR HOUSING POLICY

*Our number one responsibility in the housing or property management industry is to provide fair and consistent service to every person we encounter. Therefore, to achieve equal housing opportunities for all people regardless of their race, color, religion, sex, or national origin, familial status or disability, you must make a conscious personal commitment to eliminate bias and prejudice from your thoughts, your actions and from the housing market. This commitment is fulfilled by adherence to procedures that ensure all prospects and residents are given equal professional services.*

## FAIR HOUSING DOS AND DON'TS:

| | |
|---|---|
| *DO* | *be consistent with providing service.* |
| *DO* | *be consistent with how you treat your customers.* |
| *DO* | *document the work that you complete on each and every work order.* |
| *DO* | *refer any disabled person to the property manager if he/she wishes to modify an apartment.* |
| *DON'T* | *Specifically ask if a resident has children; ask how many <u>people</u> live in the apartment.* |
| *DON'T* | *steer anyone to a particular "area" of the community because of race, color, religion, sex, national origin, familial status, or disabled status.* |
| *DON'T* | *be afraid to ask for the resident's needs, wants and desires and try to satisfy those needs.* |
| *DON'T* | *be afraid to say, "I'll find out" if you are not sure of the answer, and ask someone before you offer anything.* |

# Exhibit G



inter(solutions)inc.

Training and Placing the Property Management Leaders of Tomorrow

January 4, 2007

Sherry Brown
325 Decatur St, NW #2
Washington, DC 20011

Re:    Payment of Back Wages from InterSolutions, Inc.

Dear Mr. Brown:

Recent events have caused InterSolutions, Inc. to reexamine its payroll records for all employees who worked overtime hours while employed by InterSolutions' concierge department from January 1, 2005 to present.

Intersolutions has always been deeply committed to its people.  We remain committed to doing everything we can to treat our people well while complying with all complex payroll rules.

As a result of our review, we have determined that you may have been underpaid in an amount of $127.04 for the overtime hours you worked during the July 29, 2005 and August 12, 2005 pay period[s].  In making you whole for the amount that may be owed to you by InterSolutions, Inc. for the overtime you performed during these pay periods, we have enclosed a check payable to you.

In addition, we are remitting you a separate check for the same amount as the first check – so we are providing you with a total of double the amount that originally may have been owed to you for the above referenced overtime, in this case a total of $254.08.

As always, we remain appreciative of the work you performed on behalf of InterSolutions, Inc.  And we remain committed to providing our people with the training and placement to become tomorrow's leaders in property management.

Please do not hesitate to contact us in the future if you have any questions regarding this payment.

Sincerely,

InterSolutions, Inc.
By: John Wagithuku

Enclosure

**INTERSOLUTIONS, INC.**
1418 PENNSYLVANIA AVE. SE
WASHINGTON, DC 20003

BANK OF AMERICA, NA
68-1/510

6353

1/5/2007

PAY TO THE
ORDER OF    Sherry Brown                                              $ **115.93

One Hundred Fifteen and 93/100************************************************************************************ DOLLARS

Sherry Brown
325 Decator St, NW #2
Washington, DC 20011

MEMO    Payment of Back Wages Check 2

⑈006353⑈ ⑆051000017⑈ 004113060331⑈

---

**INTERSOLUTIONS, INC.**                                                        6353

Sherry Brown                                                    1/5/2007

Payment of Back Wages Check 2                                    115.93
Total Earnings $127.04
Taxes
Social Security $7.88
Medicare $1.84
State: DC $1.39
Net Pay $115.93

BOA-VA-0331        Payment of Back Wages Check 2                              115.93

**INTERSOLUTIONS, INC.**
1418 PENNSYLVANIA AVE. SE
WASHINGTON, DC 20003

BANK OF AMERICA, NA
68-1/510

6352

1/5/2007

PAY TO THE
ORDER OF    Sherry Brown                                          $ **115.93

One Hundred Fifteen and 93/100************************************************************ DOLLARS

Sherry Brown
325 Decator St, NW #2
Washington, DC 20011

MEMO    Payment of Back Wages Check 1

⑈006352⑈ ⑆051000017⑆ 004113060331⑈

---

**INTERSOLUTIONS, INC.**                                              6352

Sherry Brown                                    1/5/2007

Payment of Back Wages Check 1                        115.93
Total Earnings $127.04
Taxes
Social Security $7.88
Medicare $1.84
State: DC $1.39
Net Pay $115.93

BOA-VA-0331        Payment of Back Wages Check 1                      115.93



inter solutions inc.

Training and Placing the Property Management Leaders of Tomorrow

January 4, 2007

Davelyn Miller
3315 15th St, SE #61
Washington, DC 20032

Re:    **Payment of Back Wages from InterSolutions, Inc.**

Dear Davelyn:

Recent events have caused InterSolutions, Inc. to reexamine its payroll records for all employees who worked overtime hours while employed by InterSolutions' concierge department from January 1, 2005 to present.

Intersolutions has always been deeply committed to its people. We remain committed to doing everything we can to treat our people well while complying with all complex payroll rules.

As a result of our review, we have determined that you may have been underpaid in an amount of $243.53 for the overtime hours you worked during the April 22, 2005, May 20, 2005, June 3, 2005, June 17, 2005 and August 12, 2005 pay period[s]. In making you whole for the amount that may be owed to you by InterSolutions, Inc. for the overtime you performed during these pay periods, we have enclosed a check payable to you.

In addition, we are remitting you a separate check for the same amount as the first check – so we are providing you with a total of double the amount that originally may have been owed to you for the above referenced overtime, in this case a total of $487.06.

As always, we remain appreciative of the work you performed on behalf of InterSolutions, Inc. And we remain committed to providing our people with the training and placement to become tomorrow's leaders in property management.

Please do not hesitate to contact us in the future if you have any questions regarding this payment.

Sincerely,

InterSolutions, Inc.
By: John Wagithuku

Enclosure

1418 Pennsylvania Ave., SE ◊ Washington, DC 20003 ◊ 202.546.9282 phone ◊ 202.546.4331 fax
www.propertymanagementstaffing.com