UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| Chanel Cryer, James Byrd, Jonathan Cashwell and Marc Inman, on behalf of themselves and all others similarly situated,<br>　　　　Plaintiffs,<br>　　　　v.<br>Intersolutions, Inc., Drew Golin, and Sarah Walder,<br>　　　　Defendants. | Case No. 06-02032 |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF REQUEST FOR ORDER PROHIBITING COMMUNICATIONS BETWEEN DEFENDANTS AND THEIR COUNSEL AND PUTATIVE CLASS MEMBERS REGARDING THIS LAWSUIT**

In accordance with this Court's April 25, 2007 Order, Plaintiffs hereby submit authority supporting their request that the Court prohibit Defendants and their Counsel from communicating with putative class members about this action.

In *Gulf Oil Co., et al. v. Bernard, et al.*, 452 U.S. 89, 100-01 (1981), the Supreme Court held that, "[b]ecause of the potential for abuse [in class actions], a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." *See also Hoffman-LaRoche, Inc., v. Sperling, et al.*, 493 U.S. 165, 171, 172 (1989) (applying to collective actions *Gulf Oil's* holdings regarding a court's authority to protect against the potential for misleading or discouraging communications to class members). In *Gulf Oil*, the Court explained that a district court's order limiting communications between parties and potential class members "should be based on a clear record and specific findings that

reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." *Id.* at 101.

Since *Gulf Oil,* numerous courts have limited communications between defendants and putative class members "where the communications were misleading, coercive, or an improper attempt" to undermine the class action devices by "encouraging class members not to join suit." *Belt v. Emcare, Inc., et al.,* 299 F. Supp. 2d 664, 667 (E.D. Tex. 2003) (citing cases and prohibiting the defendants from communicating with putative class members about their FLSA case, noting that they had "no legitimate reason" to communicate with class members before the end of trial); *see also Taillon v. Kohler Rental Power, Inc., et al.,* 2003 U.S. Dist. LEXIS 7275, at *10 (N.D. Ill. April 29, 2003) (in an FLSA case, the court limited the defendant's communication with class members regarding the lawsuit, finding that such an order would "cause Defendant no harm and generally promote a fair notification procedure").

As this Court noted at the April 25th status conference and other courts have recognized, a defendant's communications with its current employees are to some extent inherently coercive. *See, e.g., Ladegaard v. Hard Rock Concrete Cutters, Inc., et al.,* 2004 U.S. Dist. LEXIS 11718, at *10-11 (N.D. Ill. June 28, 2004) (precluding defendants from communicating with putative class members and noting the inherent coercion in communications between an employer and an employee); *Belt,* 299 F. Supp. 2d at 668 (noting that the defendants' communications "have heightened potential for coercion because where the absent class member and the defendant are involved in an ongoing business relationship, such as employer-employee, any communications are more likely to be coercive.")

2

The Defendants in this case have repeatedly engaged in the type of misleading communications that are contemplated by the above cases. First, Defendants in this case engaged in a long-standing practice of informing the putative class members that they were not entitled to overtime pay, thereby intentionally misleading putative class members as to their rights.[1] *See, e.g.,* Ex. A (Green Decl.) at ¶¶ 12-13. Further, soon after Plaintiffs initiated this lawsuit, Defendants began unilaterally issuing checks to a number of putative class members. *See, e.g.,* Ex. B. Defendant attached to these checks a letter that contains several misleading statements. *See id.* These letters informed potential class members that unpaid overtime "may" be owed to them and stated that one of the checks enclosed would make the person "whole" for their loss. *See id.* As a result, Defendants' communication did not accurately represent their unequivocal overtime pay obligations or the employee's right to liquidated damages. It also failed to explain the basis for the second check, which contained the mandatory liquidated damages (less improperly withheld payroll deductions), suggesting to the recipient that the second check was, essentially, a gift from Intersolutions. *See id.* Furthermore, the letters referenced a timeframe that does not span the full three years, suggesting to the recipient that, for some unknown reason, they are not entitled to an accounting prior to that date.

---

[1] Defendants' April 25th proposed notice to the Court, which emphasized that the putative member should come forward "ONLY" if they "legitimately believe" they are "still" entitled to overtime and can "substantiate that belief" is yet more of the same. As Defendants well know, it is the legal burden of Defendants to maintain the time and payroll records that can substantiate the class members' claims, not the class members' burden to maintain those records. The fact that the class member has the ultimate burden of proof and what that means would be lost on the average class members, who could read this and reasonably believe that they should not opt-in if they do not have all their records.

3

*See id.* Such misleading communications work particular mischief with respect to opt-in claims. *Belt*, 299 F. Supp. at 669.[2]

Indeed, defense counsel represented at the April 25 status conference that Defendants seek to communicate with putative class members about this lawsuit and in fact try to resolve their claims outside of this Court's review, without the presence or consent of plaintiffs' counsel. Such plans further support the argument that, without a bar to such communications, Defendants will improperly discourage putative class members from asserting their rights collectively through this litigation.[3] Therefore, Plaintiffs respectfully request that this Court issue an order prohibiting Defendants and their counsel from communicating with putative class members about this action and deny Defendants' request that such prohibitions be imposed on Plaintiffs or their counsel.

Respectfully submitted,

Date: April 26, 2007                    ____//s//_____
                                        Susan E. Huhta (D.C. Bar No. 453478)
                                        Carolyn P. Weiss (D.C. Bar No. 480697)

---

[2] Such misleading communications support not only a prohibition on communications related to this action but also Plaintiffs' language in their notice regarding putative class members' ability to opt-in despite the language of the letter and/or receipt of the checks.

[3] In contrast, there is no evidence Plaintiffs' counsel or the named Plaintiffs have provided misleading or coercive information to members of the class. Furthermore, courts are loathe to impose such communication restrictions on plaintiffs and their counsel, who are aiming to vindicate the rights of the individuals rather than limit them, and who have a need to obtain information from putative class members. *See Gulf Oil*, 452 U.S. at 101 (holding the district court erred in limiting communications between plaintiffs and potential class members because the order interfered with the plaintiffs' efforts to inform potential class members of the lawsuit, which was especially important since the members were presented with settlement offers from the defendant, and interfered with the plaintiffs' efforts to obtain information about the merits of the case); *Williams v. Chartwell Financial Servs., Ltds.*, 204 F.3d 748, 759 (7th Cir. 2000) (vacating the district court's protective order prohibiting communications between plaintiffs and putative class members, stating that "plaintiffs have a right to contact members of the putative class" and finding that the order "deprived [plaintiffs] of useful information" to support the motion for class certification); *see also, e.g., Dziennik, et al. v. Sealift, Inc., et al.*, 2006 U.S. Dist. LEXIS 33011, at *7-11 (E.D.N.Y. May 23, 2006); *Barton, et al. v. The Pantry, Inc.*, 2006 U.S. Dist. LEXIS 62989, at *6 (M.C.N.C. Aug. 31, 2006). Indeed, Plaintiffs' counsel here is listed in this Court's proposed notice as the entity whom the class member should contact with questions about the lawsuit. Plaintiffs' counsel could not respond to any such inquiries if prohibited from communicating with class members about the case.

Washington Lawyers' Committee for
  Civil Rights and Urban Affairs
11 Dupont Circle, N.W., Suite 400
Washington, D.C. 20036
Tel.: (202) 319-1000
Fax: (202) 319-1010

Thomas J. Mikula (D.C. Bar No. 396105)
Adam M. Chud (D.C. Bar No. 468443)
Sarah S. Keast (D.C. Bar No. 493632)
Goodwin Procter LLP
901 New York Avenue, N.W.
Washington, D.C. 20001
Tel.: (202) 346-4000
Fax: (202) 346-4999

*Counsel for Chanel Cryer, James Byrd,*
  *Jonathan Cashwell, and Marc Inman*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CHANEL CRYER<br>JAMES BYRD<br>JONATHAN CASHWELL<br>MARC INMAN,<br>On behalf of themselves and all others<br>similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>INTERSOLUTIONS, INC.,<br>DREW GOLIN, and<br>SARAH WALDER,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No.: 06-2032 (EGS) |

### Declaration of Linda Green

I, Linda Green, declare as follows:

1. My name is Linda Green. I am over the age of 18 and am legally competent to make this Declaration. This statement is based on my own personal knowledge.

2. I have carefully read over this Declaration before signing it, and it represents my statement. I understand that in signing this Declaration, I am swearing to tell the truth under penalty of perjury, and that it may be used in the lawsuit against Intersolutions. I also understand that I may be called as a witness in this matter and, if so, I would be able to testify competently about the facts that are in this Declaration.

3. Starting in 2003, I began working for InterSolutions as a part-time, temporary employee in InterSolutions' Concierge Division, which placed temporary employees at client sites in front desk concierge positions.

Initialed: _____

- 2 -

4. In early 2004, I began working for InterSolutions full-time as an in-house temporary employee doing basic clerical work for the billing department. I was not, however, involved in payroll practices, such as determining rates of pay, overtime pay, and other payroll matters. During this period, I worked more than forty hours per week on several occasions, but was not paid time and a half my regularly hourly wage for the hours I worked in excess of forty.

5. In the Spring of 2004, InterSolutions' co-owners, Drew Golin and Sarah Walder, hired me as the full-time permanent Manager of the Concierge Division. I served as the Concierge Division Manager until I was terminated from my position in August 2006.

6. As Manager of the Concierge Division, I reported directly to InterSolutions' co-owners, Drew Golin and Sarah Walder.

7. As a manager, I had authority for hiring, training and placing Concierge Division temporary employees, and I performed these responsibilities in a manner consistent with the training and instructions that the owners had given me.

8. Even though I was Manager of the Concierge Division, InterSolutions' co-owners always had decision-making authority over InterSolutions' payroll policies and practices, including but not limited to the employees' rate of pay, payment of overtime hours, method of payment and maintenance of employee records.

9. InterSolutions' co-owners also maintained operational control over all aspects of InterSolutions' day-to-day functions beyond payroll practices and activities.

10. Soon after I became Manager of the Concierge Division and on several additional occasions during my employment with InterSolutions, Mr. Golin informed me that Intersolutions would not pay its Concierge Division temporary employees overtime pay for hours worked in excess of forty in a given week. I was surprised and troubled by Mr. Golin's statement.

Initialed: ___

11. At some point, Mr. Golin instructed me that the one exception to InterSolutions' refusal to pay overtime was when the employees worked the overtime hours for the same client at which they worked the first forty hours because, in those situations, InterSolutions could bill the client for an overtime rate.

12. Beginning soon after I became Manager of the Concierge Division, several individual temporary employees complained about InterSolutions' denial of overtime pay and I informed Mr. Golin about these complaints. I estimate that I received complaints from one to two dozen different employees, and several complained multiple times. I also know that some employees complained directly to payroll, but I do not know how many individuals did that.

13. In response to each employee's complaint about overtime pay owed, Mr. Golin instructed me to tell the employee that he or she was not entitled to overtime pay and/or was only entitled to overtime pay if the employee worked more than forty hours per week for the same client. If the employee persisted in his or her complaints, sometimes the owners would decide to pay the complaining employee an additional amount of money less than one and a half times the regular rate of pay in order to try to appease the employee.

14. On many occasions during my employment with InterSolutions as Manager of the Concierge Division, I challenged Mr. Golin about his refusal to pay the overtime due InterSolutions' temporary employees. Sometimes I confronted him as a result of temporary employees' complaints about the company's refusal to pay overtime, and sometimes I confronted him as a result of my own ongoing concerns about the company's practice of refusing to pay overtime.

15. On all of the occasions when I confronted Mr. Golin about complaints by temporary employees who had been denied overtime pay due them by InterSolutions, Mr. Golin became

Initialed: _/s/_

angry. He became particularly angry when I raised complaints by employees who had complained previously. During these conversations, Mr. Golin would instruct me not to give the complaining employee additional work.

16. As a result of Mr. Golin's temper around issues of overtime pay, I was concerned that I would jeopardize my job if I disregarded his instructions. However, despite his instructions to the contrary, I did continue to give work to some of the employees who complained about not receiving their overtime pay. This further angered Mr. Golin.

17. In early 2006, the owners of InterSolutions hired John Wagithuka to be the Chief Executive Officer of the company and to take over some of the management of the day-to-day business operations of the company. I spoke with Mr. Wagithuka on more than one occasion about the fact that the owners of the company were denying temporary employees overtime pay that was owed to them. I impressed upon Mr. Wagithuka my concern about the company's overtime practices and he acknowledged that there was problem with these practices. I had this conversation with Mr. Wagithuka in the hope that he would convince the owners to comply with the overtime laws.

18. On or about March 2006, Mr. Wagithuka announced at a staff meeting that the company would start paying correct overtime to the temporary employees who worked for the Leasing Division but that the temporary employees of the Concierge Division would still not receive proper overtime pay.

19. In June 2006, after it became apparent that the new CEO was either unwilling or unable to influence the owners to comply with overtime laws, I filed a complaint regarding the company's overtime violations with the United States Department of Labor.

20. In August 2006, I was terminated from InterSolutions.

Initialed: ___

- 5 -

21.  At the time of my termination, InterSolutions was still denying overtime pay that was owed to the temporary employees of the Concierge Division.

22.  During the course of my employment at Intersolutions, there were approximately 400-500 temporary employees who worked in the Concierge Division.

23.  I estimate that a significant percent of the temporary employees who worked for InterSolutions' Concierge Division during my tenure with the company were denied overtime pay that was owed to them.

24.  I estimate that a significant percent of InterSolutions' concierge temporary positions and assignments were located in the State of Maryland.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 15, 2007.

_____
Linda Green

Initialed: [signature]



Training and Placing the Property Management Leaders of Tomorrow

January 4, 2007

Sherry Brown
325 Decatur St, NW #2
Washington, DC 20011

    Re:    Payment of Back Wages from InterSolutions, Inc.

Dear Mr. Brown:

    Recent events have caused InterSolutions, Inc. to reexamine its payroll records for all employees who worked overtime hours while employed by InterSolutions' concierge department from January 1, 2005 to present.

    Intersolutions has always been deeply committed to its people. We remain committed to doing everything we can to treat our people well while complying with all complex payroll rules.

    As a result of our review, we have determined that you may have been underpaid in an amount of $127.04 for the overtime hours you worked during the July 29, 2005 and August 12, 2005 pay period[s]. In making you whole for the amount that may be owed to you by InterSolutions, Inc. for the overtime you performed during these pay periods, we have enclosed a check payable to you.

    In addition, we are remitting you a separate check for the same amount as the first check – so we are providing you with a total of double the amount that originally may have been owed to you for the above referenced overtime, in this case a total of $254.08.

    As always, we remain appreciative of the work you performed on behalf of InterSolutions, Inc. And we remain committed to providing our people with the training and placement to become tomorrow's leaders in property management.

    Please do not hesitate to contact us in the future if you have any questions regarding this payment.

                                    Sincerely,

                                    InterSolutions, Inc.
                                    By: John Wagithuku

Enclosure

1418 Pennsylvania Ave., SE ♦ Washington, DC 20003 ♦ 202.546.9282 phone ♦ 202.546.4331 fax
www.propertymanagementstaffing.com

```
INTERSOLUTIONS, INC.                                          BANK OF AMERICA NA         6353
1110 PENNSYLVANIA AVE SE                                           68-1/510
WASHINGTON, DC 20003
                                                                              1/5/2007

PAY TO THE    Sherry Brown                                                    $ **115.93
ORDER OF

One Hundred Fifteen and 93/100****************************************************************  DOLLARS

    Sherry Brown
    325 Decator St, NW #2
    Washington, DC 20011

                                                                    [signature]
MEMO  Payment of Back Wages Check 2

        ⑆006353⑆ ⑇051000017⑇ 004113060331⑈
```

| INTERSOLUTIONS, INC. | | | 6353 |
|---|---|---|---|
| Sherry Brown | | 1/5/2007 | |
| | Payment of Back Wages Check 2 | | 115.93 |
| | Total Earnings $127.04 | | |
| | Taxes | | |
| | Social Security $7.88 | | |
| | Medicare $1.84 | | |
| | State: DC $1.39 | | |
| | Net Pay $115.93 | | |

| BOA-VA-0331 | Payment of Back Wages Check 2 | 115.93 |
|---|---|---|

| | | | |
|---|---|---|---|
| **INTERSOLUTIONS, INC.**<br>1418 PENNSYLVANIA AVE. SE<br>WASHINGTON, DC 20003 | | BANK OF AMERICA, NA<br>68-1/510 | **6352** |
| | | | 1/5/2007 |
| PAY TO THE ORDER OF  Sherry Brown | | | $ **115.93 |
| One Hundred Fifteen and 93/100************************************************************ | | | DOLLARS |
| Sherry Brown<br>325 Decator St, NW #2<br>Washington, DC 20011 | | | |
| MEMO  Payment of Back Wages Check 1 | | *signature* | MP |

⑈006352⑈ ⑆051000017⑆ 00411306033⑈

| | | | |
|---|---|---|---|
| **INTERSOLUTIONS, INC.** | | | 6352 |
| Sherry Brown | | 1/5/2007 | |
| | Payment of Back Wages Check 1<br>Total Earnings $127.04<br>Taxes<br>Social Security $7.88<br>Medicare $1.84<br>State: DC $1.39<br>Net Pay $115.93 | | 115.93 |

BOA-VA-0331    Payment of Back Wages Check 1    115.93